Adam **BAKER** et al., Appellants,

v.

**CITY OF ST. PETERSBURG** et al.,
Appellees.

No. 23720.

United States Court of Appeals
Fifth Circuit.

Aug. 1, 1968.

———————◆———————

Leroy D. Clark, New York City, James B. Sanderlin, St. Petersburg, Fla., Gilbert S. Edelson, New York City, for appellants.

Harry I. Young, St. Petersburg, Fla., for appellees.

Before TUTTLE and WISDOM, Circuit Judges, and HEEBE, District Judge.

WISDOM, Circuit Judge:

We are asked to apply the law of equal protection to a factual situation not previously presented to the courts. Twelve Negro officers on the police force of St. Petersburg, Florida, attack the validity of certain practices of the city's police department which are allegedly based on classification by race. The district court held that insofar as the racial classifications existed in the operations of the department, they were the product of the well-considered judgment of the Chief of Police and other administrative officials, were within the discretion of the Department, and therefore were beyond the reach of the courts. We hold that under standards set in analogous contexts, the practices here under attack do not withstand the "most rigid scrutiny" to which racial classifications must be subjected under the fourteenth amendment. Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194, 199. We reverse.

I.

The police department of St. Petersburg has 254 police officers, of whom 14 are Negro.[1] Until 1950, there were no Negroes on the force. In that year, the City hired four Negro officers and assigned them to patrolling the Negro areas of the city. Since that time, more Negroes have been added to the force, but they are largely restricted in their duties to policing Negro citizens. The Chief of Police, Harold C. Smith, testified that the force is short of its authorized strength by several men, and that he has actively tried to recruit both Negro and white men to fill these vacancies. The Department is divided into three major divisions, Uniform, Detective, and Service, with several sub-divisions. Two Negro officers are assigned to the Detective Division, two to Service, and the rest to Uniform, also referred to as Patrol. One of the Negro patrol officers is a sergeant, but none of the other Negroes is . . . in a command position. The sergeant and the detectives are not named plaintiffs in this action, but since it is a class action their rights are involved to the extent that they are members of the class.

For the purpose of police patrol, the city is divided into 16 zones. Each zone is patrolled during three shifts dai-

1. This statement of facts is based on the Findings of Fact and Conclusions of Law filed by the district court on March 31, 1966, and the hearing held on January 17 and 18, 1966. We are aware that to some extent the factual situation may have changed. On remand, the district court may wish to supplement the record in order to bring it up to date, before formulating a decree. The record, based as it is on a history of several years in this department, is by no means so stale as to make constitutional adjudica-

tion inappropriate. Cf. American Committee for Protection of Foreign Born v. Subversive Activities Control Bd., 1965, 380 U.S. 503, 85 S.Ct. 1148, 14 L.Ed.2d 39; Veterans of Abraham Lincoln Brigade v. Subversive Activities Control Bd., 1965, 380 U.S. 513, 85 S.Ct. 1153, 14 L.Ed.2d 46, where the Supreme Court declined to consider a challenge to the constitutionailty of the Subversive Activities Control Act on records six to ten years old.

ly by one radio car. The zones vary in size and character, and are designed to equalize the complaint load for each patrol car—except for Zone 13.

Zone 13 is unique in shape and area. It is irregular in shape, and as Harold Smith, Chief of Police, testified, that zone was designed to encompass the principal Negro residential and business districts. Zone 13 is entirely overlapped by other Zones, chiefly by Zone 12, and in smaller areas by Zones 1, 10, 11, and 14, so that every part of Zone 13 is also in another zone. With these exceptions, there are no other overlapping patrol zones in the city. The police administrators assert that the purpose of this overlapping is to equalize the complaint load per patrol car. Since Zone 13 has approximately twice the number of complaints as the other zones, it is given twice the patrol strength through this double coverage. Of course, this same result could have been achieved by dividing the area covered by Zone 13 into several smaller zones.

Zone 13 is also unique in its patrol force; no white officer is ever assigned to Zone 13. No Negro officer is ever assigned to any other zone, including Zone 12, which duplicates Zone 13 for about 75 percent of its area. The district court found that "the assignment of Negro officers to the predominantly Negro Zone 13 was not done for the purpose of discrimination but for the purpose of effective administration" in that "in the opinion of the Chief of Police, they are better able to cope with the inhabitants of that zone, who on occasion become abusive and aggressive toward police officers during a disturbance; and, further, that they are able to communicate with the inhabitants of the Negro area better than white officers and are better

able to identify Negroes and investigate criminal activities in that zone more effectively than white officers." The record discloses no evidence in support of Chief Smith's opinion.

Field supervision of the patrol officers is provided by the patrol sergeants. On each of the three daily shifts two sergeants are assigned, designated S–1 and S–2, with authority over the patrolmen working that shift. Depending on the shift and the current assignments, any sergeant in the Uniform division may at one time or another be S–1 or S–2.[2] If the individual assigned as S–1 or S–2 on a particular shift should be ill or otherwise unable to work, a senior patrol officer is assigned to take his place. One circumstance disturbs this otherwise regular pattern. There is one Negro sergeant in the Department, Samuel Jones. Sergeant Jones, when he is working, is always designated S–3. No one else in the Department is ever designated S–3, and Jones is never given the duties or designation of S–1 or S–2. As noted, at times a senior patrolman has those duties, even when Jones is available. Sergeant Jones's duties are vaguely defined. The Chief of Police testified that he "more or less" sets his own hours, and that his major function is to act as a liaison between Chief Smith and the Negro community of the city. According to Jones, his duties are to supervise the Negro officers assigned to Zone 13. In general, when Sergeant Jones is on duty, he has the Negro officers only under his commnd.[3] He is never assigned as desk sergeant or given any of the other positions among which the white sergeants are rotated.

On the ground floor of the police headquarters building, a locker room and other dressing facilities are pro-

2. Apparently the two sergeants divide the city in half on a North-South basis, although one witness testified that S–1 is responsible for the odd-numbered zones and S–2 for the even-numbered zones. Besides those on patrol, other sergeants may be working at the desk in the police headquarters and in other divisions of the department.

3. There are exceptions to this rule, in that if Sergeant Jones should be the senior officer at a scene where white officers are working, he will be in command, at least until a white sergeant arrives. Of course, when Jones is not on duty, the Negro officers in Zone 13 will be under the command of S–1 or S–2, a white sergeant.

vided for the use of the members of the force. All of the Negro policemen have their lockers together in one aisle. A few white officers also have lockers in that aisle, but no Negroes have lockers elsewhere in the room. None of the other facilities provided for the police officers, including wash room, showers, water fountains, and lunch counter, is segregated in any formal manner: They are freely used by all members of the force. Chief Smith, as well as the former Police Chief who testified by deposition, asserted that when the lockers were first assigned the Negroes then on the force had been asked whether they wished to have their lockers together and that through Sergeant Jones, they had indicated that they would.[4] As additional Negro officers joined the force, they were put in the same general area. Chief Smith added that if any officer came to him with a request that his locker location be changed, the request would be honored, but that he would not take such requests on a group basis.

## II.

On these facts the plaintiffs, seeking injunctive relief,[5] asserted in their complaint that the city and the police department were acting in violation of the equal protection clause of the fourteenth amendment and section 202 of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–1.[6] The district court denied the defendant's motion to dismiss the complaint. After a full evidentiary hearing, the Court found that the racial classifications were for the purpose of effective administration and not for the purpose of discrimination. The Court held that assignments "were not made in an unreasonable, arbitrary, capricious or unlawful manner," that the City Manager and Chief of Police "are vested with wide discretion in matters affecting the management and use of their personnel," and that "this Court will not substitute its judgment for that of the defendants in the performance of those matters within their jurisdiction unless there exists sufficient factual basis that the defendants' actions were unreasonable, arbitrary, capricious or unlawful and discriminatory with respect to the patrolmen." The court relied on Brooks v. School Dist. of City of Moberly, Mo., 8 Cir.1959, 267 F.2d 733, and Chambers v. Hendersonville City Bd. of Educ., W.D.N.C.1965, 245 F.Supp. 759.[7]

When the State by statute or its officials by administrative act establish racial classifications, the fourteenth amendment commands the application of stringent standards of rationality. In McLaughlin v. State of Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222, the Supreme Court summarized the law on this subject in language applicable to the issue now before this Court. That case involved the constitutional validity of a Florida statute making criminal the cohabitation of a Negro and white person of opposite sexes. Over the objection of Florida that the classification was a reasonable one, the court held the provision void:

> Normally, the widest discretion is allowed the legislative judgment in determining whether to attack some, rather than all, of the manifestations of evil aimed at; and normally that judgment is given the benefit of every

---

4. Sergeant Jones testified that he did not recall having been so consulted or having made such a request.

5. The complaint also asserted that the defendants administered discipline in a discriminatory manner to white and Negro officers, but this aspect of the case was dropped by the plaintiffs at the start of the trial.

6. This section provides: "All persons shall be entitled to be free, at any establish-

ment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof."

7. Rev'd, Chambers v. Hendersonville City Bd. of Educ., 4 Cir. 1966, 364 F.2d 189, issued after the district court's decision in this case.

conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious. [citing cases]. But we deal here with a classification based upon the race of the participants, which must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States. This strong policy renders racial classifications "constitutionally suspect." Bolling v. Sharpe, 347 U.S. 497, 499, [74 S.Ct. 693, 98 L.Ed. 884]; and subject to the "most rigid scrutiny," Korematsu v. United States, 323 U.S. 214, 216, [65 S.Ct. 193, 194, 89 L.Ed. 194]; and "in most circumstances irrelevant" to any constitutionally acceptable legislative purpose, [Kiyoshi] Hirabayashi v. United States, 320 U.S. 81, 100, [65 S.Ct. 1375, 1385, 87 L.Ed. 1774]. Thus it is that racial classifications have been held invalid in a variety of contexts. See, e.g., Tancil v. Woolls, (Virginia Board of Elections v. Hamm,) 379 U.S. 19, [85 S.Ct. 157, 13 L.Ed.2d 91] (designation of race in voting and property records); Anderson v. Martin, 375 U.S. 399, [84 S.Ct. 454, 11 L.Ed.2d 430] (designation of race on nomination papers and ballots); Watson v. City of Memphis, 373 U.S. 526, [83 S.Ct. 1314, 10 L.Ed. 2d 529] (segregation in public parks and playgrounds); Brown v. Board of Education, 349 U.S. 294, [75 S.Ct. 753, 99 L.Ed. 1083] (segregation in public schools). 379 U.S. at 191–192, 85 S.Ct. at 288.

The application of such a rigid standard has not been limited to cases where the racial classification appeared in a statute. In Lombard v. State of Louisiana, 1963, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338, the Court held that a criminal conviction arising out of an attempt by Negroes to seek service at a public lunch counter was no less invalid because it was a product of police enforcement of local custom rather than an explicit statutory prohibition. In Johnson v. State of Virginia, 1963, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195, the Court held that the practice of segregating spectators by race in a courtroom was a "manifest violation of the State's duty to deny no one the equal protection of its laws." 373 U.S. at 62, 83 S.Ct. at 1054, 10 L.Ed.2d at 196.

■ Nor do the courts permit racial classifications to be justified by the state on the basis that they were the product of a discretionary administrative determination made in good faith and not of a desire to circumvent the equal protection clause. This argument is all too familiar to this Court from the school cases, when local boards attempted to justify delay in desegregating schools by the argument that sound administrative judgment opposed immediate integration. After years of such tactics, this Court en banc called an end to administrative intransigence in United States v. Jefferson County Bd. of Educ., 5 Cir.1967, 372 F.2d 836, aff'd en banc, 380 F.2d 385, cert. denied, sub nom., Caddo Parish School Bd. v. United States, 1967, 389 U.S. 840, 88 S. Ct. 67, 19 L.Ed.2d 103.

Closely analogous to this case are the instances of discrimination against Negro school teachers arising from the desegregation of school systems. In 1965, after a period under a freedom-of-choice plan, the school system of Hendersonville, North Carolina, was integrated and the formerly all-Negro school was closed. Of the 24 Negro teachers who had taught in the system prior to this time, only eight were rehired for the new term. The teachers whose employment had been terminated and their professional association brought suit in the federal court alleging that the school board had applied more stringent standards to them than to the white teachers in the system, of whom all who indicated the desire were re-employed, together with 14 white teachers without previous experience hired as new teachers. The district judge, in an opinion cited with approval by the court below in this case,

held that while *his* judgment might have been different, he would not attempt to substitute his views for the expertise of the school board and superintendent. Chambers v. Hendersonville City Bd. of Educ., W.D.N.C.1965, 245 F.Supp. 759. The Fourth Circuit, sitting en banc, reversed. Speaking through the late Judge J. Spencer Bell, the court held that on the face of the record, discriminatory racial classification was shown. The Negro teachers had been judged on a comparative standard against each other's qualifications, and only a set number were to be hired, while white teachers were rehired unless they fell below a uniform and objective minimum standard, which none did. The court held that "in the face of the long history of racial discrimination in the community * * * the sudden decimation in the ranks of the Negro teachers did raise an inference of discrimination which thrust upon the School Board the burden of justifying its conduct by clear and convincing evidence." Chambers v. Hendersonville City Bd. of Educ., 4 Cir.1966, 364 F.2d 189, 192. Concluding that in such a context, the "professional judgment" of the administrators would not justify their conduct, the court remanded the case for the entry of an "order requiring the Board to set up definite objective standards for the employment and retention of teachers and to apply them to all teachers alike in a manner compatible with the requirements of Due Process and Equal Protection Clauses of the Constitution." Id. at 193.

Similarly, in Johnson v. Branch, 4 Cir.1966, 364 F.2d 177, the school board in a city where there had been considerable civil-rights activity, including an effort to desegregate the schools, refused to renew the contract of a Negro teacher with 12 years' experience and a previously excellent record. The Board asserted that its decision was based on certain infractions recently committed by the teacher, although her principal had excused these and recommended her reappointment. The court held that the record showed clearly that her employment had been terminated because members of the Board opposed her involvement and that of members of her family in civil-rights activity, and ordered that she be granted reinstatement and whatever damages she had suffered.

In other contexts, where judgments of an even more subjective nature were involved, the courts have held that racial classifications were invalid. In Hawkins v. North Carolina Dental Soc'y, 4 Cir.1965, 355 F.2d 718, the court held that a state dental society discriminated against a Negro dentist who was denied admission to the society. In Cypress v. Newport News Gen. and Nonsectarian Hosp. Ass'n, 4 Cir.1967, 375 F.2d 648, a private, but federally supported hospital, by a majority vote of its staff members, had refused to admit two Negro doctors to the staff privileges "for good and just cause." The hospital asserted before the court that it could not be compelled to accept an individual, and that its judgment in such cases could not be questioned by the courts. The court rejected this line of argument. The court pointed to the excellent qualifications of the rejected applicants, the fact that most white doctors in the area but no Negro doctors were admitted to the staff, and the fact that the hospital practiced racial discrimination in other aspects of its administration. In these circumstances inference of invalid conduct existed which the hospital had the duty to disprove. The court ordered that injunctive relief be granted, barring the hospital from practicing discrimination in granting staff privileges and in its treatment of patients.

■ Further, arbitrary racial classifications cannot be condoned just because of the often delicate and sensitive nature of police work. This argument has recently been rejected in a related situation in Washington v. Lee, M.D.Ala. 1966, 263 F.Supp. 327 (three-judge court), aff'd per curiam, 1968, Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212. In this action, brought to enjoin the enforcement of Alabama

statutes requiring the segregation of inmates in various penal facilities of the state, the defense contended that "the practice of racial segregation in penal facilities is a matter of routine prison security and discipline and is, therefore, not within the scope of permissible inquiry by the courts." 263 F.Supp. at 331. Judge Johnson, for the three-judge district court, in a decision which the Supreme Court found "when read as a whole * * * unexceptionable," 88 S.Ct. at 994, 19 L.Ed.2d at 1213, rejected this argument, holding that "racial discrimination by governmental authorities in the use of public facilities cannot be tolerated." The court ordered that within one year, all penal facilities of the state be desegregated.[8]

Of course, if police efficiency were an end in itself, the police would be free to put an accused on the rack. Police efficiency must yield to constitutional rights. "In a government of laws, existence of government will be imperilled if it fails to observe the law scrupulously." Olmstead v. United States, 1928, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944, 960 (Justice Brandeis, dissenting.)

### III.

The district court erred in holding that the racial classification was *merely* for the purpose of police efficiency. The exclusion of Negroes from participation in law enforcement was part of the now-rejected pattern of excluding Negroes from positions of power and influence. Not until 1950 did the City of St. Petersburg hire Negro policemen. The first Negro officers were restricted in their duties to policing the Negro areas of the city, and were instructed to call for the assistance of a white officer if they found it necessary to arrest a white person. Before the institution of the zone postal system, the Negro officers were assigned to a particular patrol car, colloquially referred to in the department as the "colored car," and restricted to patrolling the Negro areas of the city. While many of the restrictions on the Negro officers have been removed, their numbers on the force remain very small;[9] there is but the one Negro sergeant on the force; and Zone 13 remains a unique zone in the St. Petersburg police system.

■ What the St. Petersburg Police Department did was to superimpose on natural geographic zones an artificial zone that rests on the Department's judgment of Negroes as a class. The Department concluded that Negroes as a class are suitable only for the zone appropriately numbered 13. This is the kind of badge of slavery the thirteenth amendment condemns. See the majority and concurring opinions in Jones v. Mayer Co. 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189. See also United States v. Jefferson County Bd. of Educ., 372 F.2d at 872–73. However, in this case it is necessary to hold only that a Department's practice of assigning Negroes solely on the basis of race to a Negro enclave offends the equal protection clause of the fourteenth amendment.

We do not hold that the assignment of a Negro officer to a particular task be-

8. See also Singleton v. Board of Comm'rs of State Institutions, 5 Cir. 1966, 356 F.2d 771 and Board of Managers of Arkansas Training School for Boys v. George, 8 Cir. 1967, 377 F.2d 228, in which similar results were reached in actions to enjoin segregation of juvenile reform schools.

9. The plaintiffs do not assert that discrimination exists in the hiring practices of the Department, and we accept at face value the assertion of Chief Smith that he actively seeks and would welcome more Negro officers if qualified applicants would apply. The record suggests, however, that the long years of the Department's excluding Negroes, as well as the racially determined assignment patterns, may have discouraged Negroes from applying for or remaining on the police force. A low percentage of Negroes on police forces exists not just in the South but throughout the nation. A national commission relates this condition to the inferior education which Negroes often receive as well as other factors. See Report of the National Advisory Commission on Civil Disorders, 315–17, 321–22 (Bantam ed. 1968).

cause he is a Negro can never be justified.[10] It is clear, however, that, with due respect for the good faith of the Chief of Police, his opinion that Negro officers are better able to police Negro citizens cannot justify the blanket assignment of *all* Negroes, and *only* Negroes to patrol Zone 13. While strict equality is not and should not be compelled, Negro officers should be rotated among the various patrol zones of the city, in the same manner as white officers insofar as ability, available work force, and other variables permit.[11]

■■ Racial gerrymandering of political boundaries is clearly unconstitutional. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. We do not hold, however, that the drawing of Zone 13 so as to encompass most of the Negro community is invalid on its face. On remand, the burden will be on the defendants to prove that the purposes sought to be achieved by the pattern of the zone could not be achieved without the overt racial classification.

The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion. On remand, the district court should consider, besides the points with regard to the assignment of patrol officers and the pattern of Zone 13, whether under a proper standard of proof, Sergeant Jones's assignment is valid, taking into account the effect this assignment has on the aspirations of subordinate Negro officers for promotion. The effect of rotating assignments on the ability of Negro officers to gain the experience necessary to achieve promotions on an equal basis with white officers should be taken into account by the defendants and the Court in developing a constitutionally valid assignment pattern.

■ The finding of the district court that the assignment of lockers and other facilites in the police headquarters is not done on a racially discriminatory pattern is supported by the evidence.[12] The portion of the court's order relating to the assignment of lockers and other facilities is therefore affirmed.

Nothing in this opinion bears on the question of taking race into account for purposes of devising an appropriate equitable remedy, as in applying "the freezing principle". See Louisiana v. United States, 1965, 380 U.S. 145, 85 S. Ct. 817, 13 L.Ed.2d 709. Nothing we say is intended to suggest that the Negro officers on the police force of St. Petersburg should be given preferential treatment. They deserve only what they seek—equality.

Reversed and remanded.

---

10. For example, the undercover infiltration of an all-Negro criminal organization or plainclothes work in an area where a white man could not pass without notice. Special assignments might also be justified during brief periods of unusually high racial tension.

11. We decide this case on the law. We note with interest, however, that the Report of the National Advisory Commission of Civil Disorders, included the following recommendation: "Negro officers should be so assigned as to ensure that the police department is fully and visibly integrated. Some cities have adopted a policy of assigning one white and one Negro officer to patrol cars, especially in ghetto areas. These assignments result in better understanding, tempered judgment and increased ability to separate the truly suspect from the unfamiliar." pp. 316–17 (Bantam edition 1968). Among the members of the commission was Herbert Jenkins, the Chief of Police of Atlanta, Georgia.

12. Chief Smith testified that he would honor any reasonable request for a change of locker.