James F. MILLER, Plaintiff-Appellant,

v.

TEXAS STATE BOARD OF BARBER EXAMINERS, Defendants-Appellees.

No. 77–1770.

United States Court of Appeals, Fifth Circuit.

April 17, 1980.

James R. (Ron) Weddington, Austin, Tex., for plaintiff-appellant.

Robert J. Provan, Asst. Atty. Gen., John L. Hill, Atty. Gen., Douglas B. Owen, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Before GODBOLD, SIMPSON and TJO-FLAT, Circuit Judges.

SIMPSON, Circuit Judge:

Appellant-employee, James Miller, a black male, was discharged by his employer, the appellee, the Texas State Board of Barber Examiners (the Board), for failing to report to work. Miller brought the present action in the district court alleging that his discharge and prior treatment in job assignments violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. The district court correctly held that Miller is not entitled to any relief for damage resulting from the discharge because he was fired for a valid nondiscriminatory reason. However, the district court may have erred in holding that the differential treatment accorded Miller in job assignments was justified by the business necessity doctrine because it is questionable whether the doctrine applies to situations involving overt racial discrimination. Even if the doctrine was misapplied, the evidence establishes that Miller suffered no injury and is entitled to no relief.

## FACTS

The Board is an agency of the state of Texas responsible for licensing and inspecting that state's barber shops and barber colleges. The Board hired Miller as an undercover investigator in 1965. He continued in that capacity for four years, investigating both white and black barber shops. In 1969 Miller met with his supervisor, who explained that the white inspectors refused to inspect black barber shops because of fears of physical violence. Since all the inspectors were then white the black shops were not being inspected. When asked if he was willing to inspect the black shops, Miller responded affirmatively and was promoted to the position of inspector.

Miller remained in that position until he was discharged in October 1973. He was not assigned a specific geographical area as were white inspectors. Instead his inspections were generally restricted to black barber shops, although he occasionally inspected Mexican-American shops, and, less frequently, white shops. During his employment, Miller never complained of the assignment.

In 1973 the Board became dissatisfied with Miller's work primarily because he was making unauthorized inspections outside his normal geographical area of operation. Inspectors were entitled to reimbursement for travel expense and per diem when inspecting outside their normal areas. Unauthorized inspections were placing a strain on the Board's limited budget. The record also reveals that the Board was dissatisfied with the quality of Miller's inspections. For these reasons, the Board decided to transfer him from the Dallas-Ft. Worth area to Houston to give him a chance to rehabilitate himself. Miller's supervisor conveyed the Board's decision to him and instructed him to begin working in Houston. Miller neither followed these instructions nor informed the Board of his intention not to follow them. When queried by his supervisor, Miller replied only that he had no comment to make. He was discharged by the Board shortly thereafter.

In November of 1973, and at Miller's request, the Board held a hearing concerning his allegations of discrimination. After considering testimony and argument of counsel, the Board refused to reinstate him. Miller exhausted available administrative remedies and then filed the present action in the district court.

## THE DISCHARGE

Appellant attacks the validity of his discharge on two grounds. First, he argues that he was fired because of his race, a discharge based on a forbidden criterion. 42 U.S.C. § 2000e–2(a)(1). However, the district judge found that Miller was fired because he refused to go to Houston, as instructed by his supervisor, not because he is black. This finding of fact is supported by substantial evidence and must be upheld. *Bolton v. Murray Envelope Corp.*, 493 F.2d 191, 194 (5th Cir. 1974). Title VII explicitly provides that courts may not order reinstatement or backpay if the employee is discharged for a valid nondiscriminatory reason:

> No order of the court shall require . . the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual . . . was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

42 U.S.C. § 2000e–5(g). Miller's refusal to go to work in Houston provided a valid nondiscriminatory reason for his discharge.

The second prong of Miller's attack is based on the doctrine of constructive discharge. This doctrine, borrowed from the field of labor law, recognizes a Title VII cause of action for wrongful discharge when an employer deliberately creates a discriminatory environment which literally *forces* an employee to involuntarily resign. *Calcote v. Texas Educational Foundation, Inc.*, 578 F.2d 95, 97 (5th Cir. 1978); *Young v. Southwestern Savings & Loan Assn.*, 509 F.2d 140, 144 (5th Cir. 1975). Miller argues that the differential treatment he received in job assignments caused him to refuse to go to Houston; the refusal led to his discharge; and therefore he was constructively discharged. These facts do not fit the normal constructive discharge case because Miller never resigned; he was fired. Furthermore, the record does not support his contentions. For years Miller generally inspected only black barber shops without complaining, raising objections only after he was fired for a valid nondiscriminatory reason. The most likely inference to be gleaned from the record is that Miller only objected to moving to Houston, not to inspecting only black shops. His argument that the assignment *forced* him to refuse to go to Houston is meritless. Miller was discharged for a valid reason and is not entitled to relief for any injury resulting from the discharge. We now consider whether he is entitled to any relief because of the assignment to inspect only black shops.

## THE ASSIGNMENT TO INSPECT BLACK BARBER SHOPS

The Board undoubtedly treated Miller differently because of his race by assigning him generally to inspect only black shops. The district court may have erred by holding the assignment was justified by a valid business necessity: the white inspectors' refusal to inspect the black shops because of fears of physical violence.

Title VII permits discrimination in hiring and employment in certain circumstances:

> Notwithstanding any other provision of this subchapter, . . . it shall not be an unlawful employment practice for an employer to hire and employ . . . [an employee] on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . .

42 U.S.C. § 2000e–2(e)(1). This provision of Title VII permits intentional or unintentional discrimination where religion, sex or national origin is a bona fide occupational qualification. Race is conspicuously absent from the exception; therefore the bare statute could lead one to conclude that there is no exception for either intentional or unintentional racial discrimination. The Supreme Court partially faced this issue in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Duke Power Company, the employer, required

employees to have a high school education or pass a standardized general intelligence test as a prerequisite to employment or transfer to other jobs within the company. These requirements impacted more heavily upon blacks than whites. The Court found the testing and education requirements to be prohibited by Title VII where the standards were not shown to be significantly related to job performance. The Court indicated which business situations may permit racial discrimination: "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431, 91 S.Ct. at 853. The business necessity doctrine has evolved from this statement. Although authority on the precise point is "scarce if not nonexistent," 3 A. Larson, Employment Discrimination § 72.10 (1979), lower courts, including the Fifth Circuit, have generally assumed that the business necessity doctrine excepts only discriminatory practices which "are fair in form but discriminatory in operation", *Griggs v. Duke Power Co., supra,* but not overt, intentional racial discrimination. *E. g., Garcia v. Gloor,* 609 F.2d 156 (5th Cir. 1980) (dictum); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 244 (5th Cir. 1974), *rehearing denied,* 494 F.2d 1296, *cert. denied* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (stating in dictum that the doctrine excepts only "those few employment practices, which are *nonintentionally* discriminatory or neutral, but perpetuate the consequences of past discrimination because of their overriding business necessity"). See Annot., *What Constitutes "Business Necessity" Justifying Employment Practice Prima Facie Discriminatory Under Title VII of the Civil Rights Act of 1964,* 36 A.L.R. Fed. 9 (1978) for a full discussion of the many facets of the doctrine. In summary, the parallel business necessity and bona fide occupational qualification exceptions have two main differences. The legislatively created bona fide occupational qual-

ification exception does not apply to racial discrimination but the judicially created business necessity doctrine does. The bona fide occupational qualification exception applies to intentional and unintentional discrimination but the business necessity doctrine is apparently limited to practices which are facially neutral but discriminatory in operation.

Limitation of the business necessity doctrine to covert discrimination is questionable on logical and perhaps legal grounds. *Griggs v. Duke Power Co., supra,* involved a facially neutral discriminatory practice, but the opinion has no language which absolutely requires that the doctrine be so limited. Conceivably situations will arise where a business necessity (or similar) exception is warranted for intentional racial discrimination. Two possible situations are illustrated by this court's opinion in *Baker v. City of St. Petersburg,* 400 F.2d 294 (1968). The St. Petersburg police department had largely restricted the duties of black officers to policing black citizens. The court found the practice to be a violation of equal protection, but the opinion proffered two situations where assignment of blacks to a particular task may be permissible: "For example, the undercover infiltration of an all-Negro criminal organization or plainclothes work in an area where a white man could not pass without notice. Special assignments might also be justified during brief periods of unusually high racial tension." *Id.* at 301, n. 10. *Baker* was decided before the development of the business necessity doctrine and before the 1972 amendments to Title VII, which made the Act applicable to municipal and governmental employers, including police departments. 42 U.S.C. 2000e(a) (as amended in 1972); *Allen v. City of Mobile,* 466 F.2d 122, 126 (5th Cir. 1972) (Goldberg, J., dissent) *cert. denied* 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975. Now that Title VII applies to police departments, even the black on black assignments tentatively approved in *Baker* may be prohibited unless a business or similar exception is recognized for such intentional discrimination. Similarly, in the instant situation Mil-

ler was assigned for years as an undercover investigator of black barber shops because he is black. None of the white investigators were assigned these duties for reasons easily understood; it is difficult to imagine a caucasian successfully disguised as a shoeshine boy in or as a patron of an all black barber shop.[1] A business necessity exception may also be appropriate in the selection of actors to play certain roles. For example, it is likely that a black actor could not appropriately portray George Wallace, and a white actor could not appropriately portray Martin Luther King, Jr. One commentator who has addressed this specific problem suggests that an employer may avoid the dilemma by phrasing his requirement in neutral terms:

> Perhaps the only way an employer could deal with this type of problem would be to cast his requirements in neutral terms so as to come within *Griggs* and its business necessity rule. The employer might, let us say, announce that he will consider applicants for the part of Henry VIII only if they bear a sufficient likeness to Henry VIII so that, with suitable make-up, they would present a convincing representation of the well-known monarch. This would rule out women, and many men too thin to be successfully padded out or too short to be adequately regal, as well as most blacks. As to black applicants, the employer could quite possibly contend persuasively that no amount of white make-up would do an adequate job of transformation, just as no amount of padding would save the day for a 110-pound white aspirant. Therefore, the neutral test of rough similarity to Henry might be successfully backed up by the business necessity rule.

3 A. Larsen, *supra*, § 72.10. It is unlikely that we would either require or be deceived

by such convoluted semantical gymnastics, particularly where our research reveals no case in which the limitation of the business necessity doctrine was necessary to the decision.

Nevertheless this case is not the appropriate vehicle for consideration of an expansion of the business necessity doctrine. First, the issue was never recognized or argued by the parties. Appellant, appellee and the trial judge alike simply assumed the doctrine was applicable to intentional discrimination; the only conflict concerned whether the assignment was justified by business necessity, not whether the doctrine was applicable. Second, it is questionable whether Miller's assignment was justified by business necessity. Finally, even if the doctrine does not apply, Miller is not entitled to any award.

 Only equitable relief, including but not limited to backpay and reinstatement, is available under Title VII.[2] The record reveals that Miller suffered no diminution in pay or benefits as a result of the discriminatory assignment; therefore an award of backpay is not appropriate. Reinstatement is likewise not appropriate because Miller was discharged for a valid nondiscriminatory reason. 42 U.S.C. § 2000e–5(g). *See generally* 2 A. Larson, *supra*, § 55.41. If he cannot be reinstated, reassignment is not possible. The injunctive relief sought in his complaint is not appropriate because this is not a class action and because Miller is no longer an employee of the appellee. Punitive damages are a legal remedy and are not available in a Title VII cause of action. *E. g. Great American Federal Savings & Loan Assn. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 2350–51, 60 L.Ed.2d 957, 965 (1979); *Richerson v. Jones,* 551 F.2d 918, 926–27 (3d Cir. 1977). *See gener-*

---

1. Of course we recognize that a business necessity argument is weaker if applied to Miller's assignment as an inspector (as opposed to undercover investigator) of only black barber shops.

2. 42 U.S.C. § 2000e–5(g). Miller also alleged violation of 42 U.S.C. § 1981. Relief under that section is not limited to equitable remedies. *Johnson v. Railway Express Agency, Inc.,* 421

U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). However, for reasons not apparent in the record before us, the § 1981 claim was abandoned some time before appeal. The district court opinion does not discuss § 1981 and it is not mentioned in the brief of either party. Accordingly, we do not consider whether Miller would be entitled to relief under 42 U.S.C. § 1981.

*ally* 2 A. Larson, *supra,* § 52.42. Finally, attorney fees and costs are only awardable to the "prevailing party" in a Title VII cause of action. 42 U.S.C. § 2000e–5(k); *Adams v. Reed,* 567 F.2d 1283, 1287–88 (5th Cir. 1978). If the business necessity doctrine does not apply, then there is a skeletal showing that Miller was treated differently because of his race, but that he agreed to that treatment before he was assigned to the position. We recognize that a Title VII plaintiff who only partially prevails may be entitled to an award of attorney fees. *Adams v. Reed, supra,* 567 F.2d at 1287–88. However the "prevailing party" language of the statute cannot be stretched to include this situation where there is no injury, and the plaintiff has failed to obtain any relief for either himself, a class or society in general.

Appellant is not entitled to any relief even though the district judge may have erroneously applied the business necessity doctrine. The judgment is

AFFIRMED.