**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-20420
Summary Calendar

SELENA GORDON, also known as Jazmine;
STEPHANIE MCDANIEL, also known as Simone;
CHRISTINA SEARD,

Plaintiffs-Appellees,

versus

JKP ENTERPRISES INC, doing business as Caligula XXI;
JERRY K. PAYNE, Individually and in his official capacity,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas
(No. H-99-CV-138)

April 9, 2002

Before DAVIS, BENAVIDES, and STEWART, Circuit Judges.

PER CURIAM:*

        Plaintiffs Selena Gordon ("Gordon"), Stephanie McDaniel ("McDaniel"), and Christina Seard

("Seard") filed suit against their former employer, Defendants J.K.P. Enterprises, Inc d/b/a Caligula

        *Pursuant to 5ᵀᴴ CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ CIR. R. 47.5.4.

XXI ("Caligula XXI") and Jerry S. Payne ("Payne"), alleging race discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. After a bench trial, the district court entered judgment in favor of Gorden, McDaniel, and Seard and awarded compensatory damages, injunctive relief, and attorneys' fees. For the reasons assigned herein, we affirm in part, reverse in part, and remand with instructions.

FACTUAL AND PROCEDURAL BACKGROUND

In 1980, Caligula XXI opened as a topless club in Houston, Texas. In the latter half of the 1990s, Payne, the owner of Caligula XXI, implemented several club policies that applied to the topless dancers. A policy was adopted which limited the number of African-American dancers that could work on each shift. A music format policy was also implemented that prohibited dancers from performing to "Rap," "Hip-Hop," and "R&B." Payne testified that the purpose of the policies was to maintain a racially balanced club and to keep the club profitable. The music policy was embodied in a memo dated September 9, 1997 that repeatedly justified the policy on the basis that the club's goal was to have a racially mixed group of customers.

Gordon, McDaniel, and Seard, who are African-American, were employed as topless dancers at Caligula XXI. Gordon and McDaniel were employed by Caligula XXI from March of 1997 until December of 1997, when they were prevented from working on a particular day. Gordon and McDaniel testified that they were told by Mike Tucker, a club manager, that they were fired because there were too many African-American dancers who wanted to work at the club. They were rehired in December of 1997, but were again terminated in January of 1998. This final termination followed an incident where another manager approached Gordon and McDaniel, while they were sitting with some customers, and asked them to leave the club. Gordon and McDaniel testified that when the

2

manager refused to give them a reason for his demand, McDaniel began to scream and curse at the manager.

Seard was employed by Caligula XXI for three months in either 1994 or 1995, but she was fired after being told that the club was eliminating African-American dancers. She was rehired in 1996, but was again terminated in December of 1998. Seard and Christina Shepard ("Shepard"), a waitress at Caligula XXI from 1995 to October of 1999, testified that upon arriving at work on the day before Seard was terminated, the doorman told Seard that she could not work because there were too many African-American dancers. They also testified that Mitchell White ("White"), the manager at that time, said that there were seven African-American dancers already working that night and he was not accepting any more African-American dancers. Seard became very upset about being told to go home. The next day Mitchell fired her. The district court heard testimony that Mitchell fired Seard because she (1) was too "ethnic" or "pro black," (2) was behind on her "tip-out," (3) threw a fit, (4) was too fat, and (5) was African-American.

Shepard testified about several club policies which applied to dancers. According to Shepard, the policy limiting the number of African-American dancers who could work on each shift was consistently enforced. Shepard testified that, for example, if there were thirty dancers working, only five could be African-American. The manager was required to enforce this policy and he did so by refusing African-American dancers admittance to the club if the maximum number of African-American dancers had been reached. There was no limit on the number of dancers who could dance any particular shift; and no non-African-American dancer was ever turned away. On several occasions, Shepard observed Payne tell the manager that there were too many African-American dancers or too many African-American customers and to not admit any more African-American

3

dancers and/or customers to the club. Shepard heard Payne state on several occasions that the club was looking "mighty dark," "out of control," and "too ethnic," referring to the number of African-American dancers working. Shepard and Mary Spiller ("Spiller"), another waitress at Caligula XXI, observed African-American applicants submit job applications only to have management throw them in the trash. Spiller heard Payne refer to a black waitress as a "nigger."

Mark Chavarria ("Chavarria"), a manager at Caligula XXI between 1994 and 1996, worked at the front door and enforced certain club policies. He testified that only five or six African-American dancers could work any particular shift and that as the manager at the front door, it was his job to strictly enforce this policy and not let additional African-American dancers into the club once the limit had been reached. Chavarria testified that there was no restriction on the number of non-African-American dancers. According to Chavarria, Payne told him that the number of African-American dancers was limited because they brought in a "bad element," that is, African-American men. Chavarria testified that, in Payne's opinion, African-American men did not spend any money and were associated with drugs and fights. In furtherance of the club's policy to limit the number of African-American dancers, Chavarria had to terminate a number of African-American dancers because there were too many.

Given this and other evidence, the district court concluded that Gordon, McDaniel, and Seard were terminated because of their race. The district court found the reasons given by Caligula XXI and Payne for their terminations to be pretexts for racial discrimination. Further, the court determined that there could be no defense to the disparity of treatment between African-American dancers and non-African-American dancers, which was blatantly racial. In her conclusions of law, Magistrate Judge Nancy K. Johnson stated as follows: "It is certainly not a defense to discriminate

4

in such a way because the club historically had a racially balanced clientele which the owner wished to preserve. No employer can lawfully maintain any particular racial makeup in its workplace by discriminating."

The district court found that Caligula XXI and Payne acted illegally as a matter of law and entered a final judgment in favor of Gordon, McDaniel, and Seard on their claims of race discrimination under both Title VII and § 1981. The district court awarded Gordon, McDaniel, and Seard $5,000 each in compensatory damages for emotional distress and enjoined Caligula XXI and Payne from using such discriminatory employment practices in the future. Further, the district court ruled that Gordon, McDaniel, and Seard were "prevailing parties" which entitled them to recover attorneys' fees in the amount of $28,837.50 and $5,000 in attorneys' fees if they prevail on appeal.

## DISCUSSION

Caligula XXI and Payne raise the following issues on appeal: (1) whether the use of race as a factor in their attempt to select a diverse array of topless dancers violated Title VII and § 1981; (2) whether the district court abused its discretion in awarding compensatory damages for emotional distress; (3) whether the district court erred in issuing an injunction; (4) whether the district court erred in awarding attorneys' fees. We address each of these issues below.

Caligula XXI and Payne admit that they used race as a factor in choosing an array of topless dancers; however, they argue that the district court erred by holding that this intentional racial discrimination was not justified under the circumstances of this case. They assert "business necessity" as a defense, arguing that they considered race for the sole purpose of presenting a diverse and integrated dance show on each shift in order to maintain a diverse establishment, which was critical to the success of Caligula XXI. As authority, they cite dicta in Miller v. Texas State Board of Barber

5

Examiners, where we suggested that "[c]onceivably situations will arise where a business necessity (or similar) exception is warranted for intentional racial discrimination." 615 F.2d 650, 653 (5th Cir. 1980).[1] Their reliance on this case is misplaced. Business necessity is a defense to disparate impact analysis, and not to cases of overt discrimination or disparate treatment. Title VII, as amended by the Civil Rights Act of 1991, provides:

> An unlawful employment practice based on disparate impact is established under this title only if . . . a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national original and the respondent fails to demonstrate that the challenged practice is job related for the position and consistent with business necessity . . . .

42 U.S.C. § 2000e-2(k)(1)(A)(i). The business necessity defense evolved primarily from Griggs v. Duke Power Co., 401 U.S. 424 (1971), as a defense to claims that facially neutral employment practices have discriminatory effects. Miller, 615 F.2d at 653. Thus, when Miller was decided, the business necessity defense had no statutory basis, and Griggs had "no language which absolutely require[d] that the doctrine be . . . limited to [covert discrimination]." Id. In 1991, however, Congress codified the business necessity defense as the appropriate standard for disparate impact cases, making explicit that "a demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination." 42 U.S.C. § 2000e-2(k)(2). The business necessity defense is also not available to a § 1981 defendant. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 389 (1982) (holding that § 1981 liability must be grounded on intentional discrimination).

---

[1]For example, we stated that "a business necessity exception may . . . be appropriate in the selection of actors to play a certain role." 615 F.2d at 653.

The defense of "bona fide occupational qualification" (BFOQ) allows for intentional discrimination in employment in the narrow circumstances where such discrimination is "reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1). This provision of Title VII limits the BFOQ defense to intentional discrimination on the basis of gender, national origin, and religion; race is specifically excluded from this section. Id.; Swint v. Pullman-Standard, 624 F.2d 525, 535 (5th Cir. 1980), overruled on other grounds by 456 U.S. 273 (1982) ("We believe that the omission of race and color as [BFOQs] was deliberate and intentional on the part of Congress."); Miller, 615 F.2d at 652 (acknowledging that race is "conspicuously absent" from the BFOQ provision). Thus, we have held that the BFOQ defense is not available in race discrimination cases. Swint, 624 F.2d at 535. Because § 1981 proscribes discrimination solely on the basis of race, the BFOQ defense is not available to the § 1981 defendant. No judicially-crafted racial BFOQ has been recognized by this Circuit, and we decline to do so today. In sum, the business necessity and BFOQ defenses are not available to Caligula XXI and Payne, who are accused of intentional racial discrimination.[2] Thus, we affirm the district court's holding that Caligula XXI and Payne violated Title VII and § 1981.

---

[2]Caligula XXI and Payne rely on a Second Circuit decision, Otero v. N.Y. City Housing Auth., 484 F.2d 1122 (2d Cir. 1973), as support for the contention that their intentional discrimination on the basis of race may also be justified under the "tipping doctrine." For reasons too numerous to elucidate, their reliance on this case, which dealt with the Housing Authority's affirmative duty to integrate housing under the Fair Housing Act, is clearly misguided. The fact that Caligula XXI and Payne feared that failure to consider race in selecting an array of topless dancers would have a "tipping" effect, causing the club's customers to engage in the so-called "white flight" phenomenon, is not a defense to its racially discriminatory employment policies. Thus, we agree with the district court's conclusion that "[i]t is certainly not a defense to discriminate in such a way because the club historically had a racially balanced clientele which the owner wished to preserve."

The district court awarded compensatory damages in the amount of $5000 to Gordon, McDaniel, and Seard for "emotional distress, humiliation, and indignation suffered because of the illegal discrimination found by the court." Title VII and § 1981 allow an award of compensatory damages for emotional distress or mental anguish. See, e.g., Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 940 (5th Cir. 1996). Caligula XXI and Payne argue that the evidence was insufficient to support an award of mental anguish damages, citing Patterson. We review the award of mental anguish damages for abuse of discretion. Id.

In Patterson, we held that awards of mental anguish damages under § 1981 and Title VII are governed by the same rules, and that such damages cannot be recovered unless the specificity requirement set out in Carey v. Piphus, 435 U.S. 247, 255-56 (1978), is satisfied. Patterson, 90 F.3d at 940. To meet his requirement, the claimant must show "some specific discernable injury to the claimant's emotional state." Id. Patterson looked to an EEOC policy statement which recognizes that emotional harm may manifest itself in numerous ways, including " 'sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown.' " Id. at 939 (quoting EEOC POLICY GUIDANCE NO. 915.002 § II(A)(2) (July 14, 1992)). We also observed that some other circuits "have recognized that a claimant's testimony alone *may* not be sufficient to support anything more than a nominal damage award," and that Carey "requires a degree of specificity which *may* include corroborating testimony or medical or psychological evidence in support of the damage award." Id. at 938, 940. Our subsequent cases, however, make it evident that we do not require medical evidence or corroborating testimony for an award of mental anguish damages. See Oden v. Oktibbeha County, Miss., 246 F.3d 458, 470-71 (5th Cir. 2001); Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1046 (5th Cir. 1998).

8

The Patterson court vacated mental anguish damages granted to the plaintiffs, Patterson and Brown, and remanded for awards of nominal damages. Patterson testified that her termination "emotionally scarred her and resulted in unemployment for almost one year." 90 F.3d at 940. We held that Patterson had not offered sufficient evidence to support the $150,000 award of mental anguish damages, noting the lack of medical evidence or corroborating testimony and that "[n]o evidence suggests that Patterson was humiliated or subjected to any kind of hostile work environment." Id. Brown testified that the work environment was "unbearable" and was "tearing [his] self-esteem down," and that the discriminatory conduct "hurt" and made him "angry" and "frustrated." Id. at 939. Noting the lack of corroborating testimony or medical evidence and that "[n]o evidence suggests that Brown suffered from sleeplessness, anxiety or depression," we found that this evidence was insufficient to support the $40,000 for emotional distress. Id. at 939-40.

In Farpella-Crosby v. Horizon Health Care, we upheld a jury award of compensatory damages in the amount of $7,500. 97 F.3d 803, 809 (5th Cir. 1996). Farpella-Crosby testified that her work environment was "very stressful," that she was "embarrassed every time [she] went in there," and that she felt "very embarrassed, very belittled," "very disgusted," "hopeless," "about two inches high," as a result of her supervisor's harassment. Id. Farpella-Crosby's testimony was corroborated by a friend, who testified that she and Farpella-Crosby began to go everywhere together because there was "safety in numbers." Id. Distinguishing Patterson, we held that this evidence was sufficient because Farpella-Crosby "presented both evidence that she was subjected to a hostile work environment and evidence from which the jury could have inferred that she experienced stress and humiliation." Id.

9

In Migis, we concluded that the evidence, which consisted solely of Migis's testimony, was sufficiently detailed to preclude us from holding that the district court abused its discretion in awarding $5,000 in compensatory damages for mental anguish. 135 F.3d at 1047. Migis testified that her termination was "a major inconvenience" and that her employer's discrimination caused her low self-esteem, financial and marital hardships, "stress attacks or anxiety attacks," "major stress," "lot[s] of crying," and "sleeplessness." Id. at 1046.

In Oden, we determined that there was sufficient evidence to support a jury award of $20,000 in compensatory damages for mental anguish. 246 F.3d at 471. Oden testified that as a result of the defendants' discrimination, he experienced stress, sleeplessness, betrayal, and shame. Id.

In the instant case, the district court awarded $5,000 for emotional distress to Seard, Gordon, and McDaniel. Seard testified that she did not understand the policy limiting the number of African-American dancers and that it was "hurtful," "confusing," and "very unfair." She also testified that because she is of mixed parentage and never knew her Caucasian mother, the policy reinforced the maternal rejection that she suffered because of her race. Further, Seard testified that the policies caused her loss of self-esteem and that she felt "belittled" and that she was "not equal or good enough to be on the same level with other people in the club that are employed there." She also stated that she was "outraged" after being turned away on the day before she was terminated and that she begged White to let her work that night. When he refused, she became upset and went into the dancers' dressing room, crying and screaming. Seard's testimony is corroborated by Shepard, who testified that Seard was crying and that she screamed, "[C]an you believe they're doing this because I'm black." This testimony of emotional distress, humiliation, and loss of self-esteem was sufficiently

10

detailed to preclude us from holding that the district court abused its discretion in awarding Seard $5,000 in compensatory damages.

Gordon testified that the limitation on the number of African-American dancers affected her emotionally and that she never knew on any particular day whether she could work. She recalled that several times she rode the bus to Caligula XXI with another African-American dancer and they had to decide which of them would work because of the limitation. Dancing at Caligula XXI was her only source of income and she had to pay bills without knowing if she would be able to work. If she was turned away, she would rush to the club the next day so that she could try to make the money to pay her bills. We find that the district court did not abuse its discretion in concluding that Gordon suffered emotional harm which manifested itself through stress and emotional distress. Gordon's testimony is sufficient to support the $5,000 award of mental anguish damages.

McDaniel testified that the policy limiting the number of African-American dancers caused conflict between the dancers, required the dancers to arrive early so that they could work, and affected her ability to make an income. Regarding her termination in January of 1998, McDaniel testified that after the manager told her to leave the club, she lost her temper and started screaming and cursing at the manager. This testimony is the only evidence submitted by McDaniel in support of her emotional distress claim. We hold that McDaniel's testimony of emotional distress is insufficient to support anything more than a nominal damage award. While the district court could infer that being subjected to these discriminatory policies would cause emotional distress, McDaniel did not satisfy the specificity requirement set out in Carey. McDaniel's testimony does not go beyond Brown's testimony of "[h]urt feelings, anger and frustration" in Patterson. 90 F.3d at 940. We find that the district court abused its discretion in awarding emotional distress damages to McDaniel.

11

Consequently, we vacate the district court's $5,000 emotional distress award as to McDaniel and remand the case with instructions for the district court to award nominal damages.

Caligula XXI and Payne next attack the district court's award of injunctive relief.[3] The district court, after holding that Gordon, McDaniel, and Seard prevailed on their claims of race discrimination under both Title VII and § 1981, made the following finding: "Because of the blatant nature of the discrimination, and the probability that the discriminatory employment practices will continue to occur if not enjoined, the court finds that an injunction barring future discrimination is appropriate." Caligula XXI and Payne argue that there was no basis for an injunction because Gordon, McDaniel, and Seard no longer work at Caligula XXI, they do not seek reinstatement, they express no desire to work there again, and the suit is not a class action. We agree that injunctive relief is inappropriate in this case.

Equitable relief is available under both Title VII and § 1981. 42 U.S.C. § 2000e-5(g) (Title VII); Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 460 (1975) (§ 1981). The fact that Gordon, McDaniel, and Seard made only a general request for equitable relief does not prevent them from being awarded an injunction. See FED. R. CIV. P. 54(c). Section 2000e-5(g) enables courts to

---

[3]The district court issued the following injunction:
[T]hat Defendants, JKP Enterprises, Inc., d/b/a Caligula XXI and Jerry Payne, individually, their employees, servants, agents and assigns are hereby ENJOINED from doing the following:
(1) Creating, implementing and enforcing any policy which limits the number of, or denies African-American (Black) dancers from dancing during any particular work shift without also limiting or denying non-African-American dancers from dancing. The number of dancers per shift shall only be limited, if necessary, by the aggregate total number of dancers, without regard to ethnicity.
(2) Discriminating in the hiring or termination of African-American (Black) dancers.
(3) Selectively enforcing policies on the basis of race.

12

grant a wide range of relief to combat discriminatory employment practices.[4]  We have recognized that, in Title VII cases, "once the judicial machinery has been set in train, the proceeding takes on a public character in which remedies are devised to vindicate the policies of the Act, not merely to afford private relief to the employee."  Hutchings v. U.S. Indus., Inc., 428 F.2d 303, 311 (5th Cir. 1970).  Thus, injunctive relief which benefits individuals not party to the action may sometimes be proper even where the suit is an individual action, as opposed to a class action.  Meyer v. Brown & Root Constr. Co., 661 F.2d 369, 373-74 (5th Cir. 1981).  In the instant case, however, the facts do not warrant injunctive relief because Gordon, McDaniel, and Seard are no longer employed with Caligula XXI, do not seek reinstatement, have not indicated that they plan to seek employment with Caligula XXI in the future, and have shown no other way in which they would benefit from the injunction.  Thus, the injunctive relief is unnecessary to the "just disposition of the action."  Id.; see also Armstrong v. Turner Indus., Inc., 141 F.3d 554, 563-64 (5th Cir. 1998) (holding that an unsuccessful job applicant lacked standing to procure injunctive relief where the applicant alleged only a single, past violation, did not indicate that he planned to seek employment with the employer again, and did not purport to represent a specific class of individuals in danger of discrimination); Miller v. Tex. State Bd. of Barber Examiners, 615 F.2d 650, 654 (5th Cir. 1980) (holding that injunctive relief was inappropriate because the suit was not a class action, the plaintiff was a former employee, and

---

[4]Title VII provides, in pertinent part:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay, . . . or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g).

the plaintiff was not entitled to reinstatement). We therefore reverse the portion of the district court's judgment granting injunctive relief.

Caligula XXI and Payne also challenge the district court's award of $28,837.50 in attorneys' fees. Pursuant to 42 U.S.C. § 1988(b), district courts may award fees to prevailing parties in civil rights actions. "We review a district court's award of attorneys' fees for abuse of discretion, and its factual findings relating to the award of attorneys' fees for clear error." Simi Inv. Co., Inc. v. Harris County, Tex., 236 F.3d 240, 255 (5th Cir. 2000) (citation and internal quotations omitted).

Caligula XXI and Payne do not dispute that Gordon, McDaniel, and Seard are "prevailing parties" under § 1988. Instead, they argue that the district court's award of "nominal damages" does not support the award of attorneys' fees. In support of their assertion that nominal damages, as opposed to compensatory damages, were awarded, they point out that Gordon, McDaniel, and Seard were each awarded the same amount and that the district court referred to the award of $5,0000 as "nominal."[5] This argument is meritless.[6] The district court found that (1) Caligula XXI discriminated against Gordon, McDaniel, and Seard, in violation of Title VII; (2) Gordon, McDaniel, and Seard met their burden of proof on their § 1981 claims; and (3) that Gordon, McDaniel, and Seard are "entitled

---

[5]When considering attorneys' fees, the district court stated as follows:
**Amount involved and results obtained.** Although Plaintiffs prevailed on their claims of race discrimination, each was awarded a *nominal* sum of $5,000. Although this normally might warrant a reduction in the amount of attorney's fees awarded, in this case the court finds that the Plaintiffs' main goal was to obtain injunctive relief, which will be entered against the Defendants. Accordingly, the court does not deem a reduction of fees to be appropriate.
(emphasis added).

[6]Thus, we do not address the issue of whether nominal damages, which qualify Gordon, McDaniel, and Seard as "prevailing parties" under § 1988, would support the award of attorneys' fees. See Hopwood v. Texas, 236 F.3d 256, 278 & n.83 (5th Cir. 2000) ("Even nominal damages can support an award of attorneys' fees.").

14

to $5,000 in *compensatory damages* for the emotional distress, humiliation, and indignation suffered." (emphasis added). The district court's characterization of the compensatory damages award as "nominal" merely recognizes that Gordon, McDaniel, and Seard achieved only limited monetary relief. Having found that the district court did not abuse its discretion in awarding Seard and Gordon $5,000 each in compensatory damages for emotional distress, and that McDaniel is a "prevailing party" entitled to nominal damages, we conclude that an award of attorneys' fees is proper. The award of $28,837.50 in attorneys' fees, however, was necessarily based on the total relief granted by the district court. We conclude that our reversal of the injunctive relief awarded warrants remand to the district court for reconsideration of the amount of the attorneys' fee award in light of the relief remaining.

## CONCLUSION

We affirm the district court's finding that Caligula XXI and Payne intentionally discriminated on the basis of race in violation of Title VII and § 1981. In addition, we affirm the awards of compensatory damages as to both Seard and Gordon. However, we vacate the district court's emotional distress award as to McDaniel and remand for an award of nominal damages. We also reverse the portion of the district court's judgment granting injunctive relief. We remand the award of attorneys' fees for reconsideration in light of this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

15