Kenneth RAY, Plaintiff,

v.

UNIVERSITY OF ARKANSAS and The Board of Trustees of the University of Arkansas as a Public Corporation, Defendants.

No. PB–C–93–311.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

March 3, 1994.

Judgment March 24, 1994.

petitioner's counsels' work in this case.

John T. Lavey, Lavey & Burnett, Little Rock, AR, for plaintiff.

Jeffrey A. Bell, Deputy Atty. General's Office, Little Rock, AR, Ginger Parker Crisp, University of Arkansas, Office of the Gen. Counsel, Fayetteville, AR, Fred H. Harrison, University of Arkansas, Gen. Counsel, Little Rock, AR, for defendants.

## MEMORANDUM OPINION

EISELE, District Judge.

The UAPB Department of Public Safety in its own way reflects the current ambivalence among some blacks (and other ethnic, language and religious groups) reflecting the tension between integration and cultural identity. That such a dichotomy of opinion exists on the campus of UAPB is obvious from the evidence received during this trial.

Before dealing with that evidence in some detail, the Court notes certain more or less incidental reflections of that tension in the UAPB community.

One witness, Mr. Charles L. McCullough, after finishing testifying about an incident which occurred on January 17, 1993, asked if he could say something. The Court granted him permission to speak. He stated that even before that incident he was going to petition to have Officer Ray removed. Although he had only been enrolled at the University for a few weeks, and even though he had had little or no personal experience with Officer Ray, he stated that he had been told that many students wanted Ray gone. And in his earlier testimony he stated that he had learned about Officer Ray from the "kids on the campus" and that they told him that Ray had been stopping and bothering them and that he shot someone. In his written statement (Defendant's Exhibit 41) given at the request of Chief Grice on January 25, 1993, he states:

> I think this type of officer is not needed at this black University, because it is obveaus (sic) that he has a lot of predudus (sic) in him. As a student at this University I'm very concerned about this problem.

And Captain Betty Griffin, when questioned about the apparent disparity in the discipline recommended for Officer Chris Taylor compared with that recommended for Mr. Ray, stated that Mr. Ray as a "minority" thought he could do what he wanted and was "showing me you can't tell me anything."

On the other hand, many of Mr. Ray's fellow officers, all black, testified that he was a very good police officer and not in any way racist. Ray was clearly accepted by them as a friend and professional colleague. All of the witnesses who testified at the trial, with exception of Officer Ray, are black. So the differing views as to his conduct and performance are not race correlated.

### Background

Mr. Kenneth Ray grew up in Pine Bluff and graduated from Dollarway High School, and took then some courses at UAPB. He served in the U.S. Marine Corp from 1983–1986, did some mechanic work, and then joined the Pine Bluff Police Department in 1988 where he worked for one year before having a motorcycle accident which damaged his knee. On November 1, 1989, he was hired by UAPB as a Public Safety Officer I, usually referred to as "patrolman." He served there in that position until his discharge which, for pay purposes, was effective on March 12, 1993.

As a patrolman Mr. Ray was to respond to calls; prepare accident reports; protect crime scenes; gather and preserve evidence for possible Court action; handle traffic and "issue traffic tickets to all violators"; patrol and keep close surveillance on students, visitors, staff, faculty, and University property and, indeed, the "entire campus"; enforce state statutes, city ordinances and pertinent University regulations; preserve order; and, in general, follow the instructions of his superiors. What a patrolman actually does on any particular day depends to an extent on the shift to which he or she is assigned. There were three basic shifts in effect while Mr. Ray worked in the Department: 7 A.M. until 3 P.M.; 3 P.M. until 11 P.M.; and 11 P.M. until 7 A.M. Those shifts were supposed to be rotated every month.

An incident occurred early in 1991 involving an argument between 3 or 4 women and 4 to 6 men, all African–Americans.[1] The incident happened around 10:30 P.M. Officer Ray attempted to prevent an escalation of the confrontation but was not able to control the crowd which became quite large and unruly. Apparently there was a charge that he struck a female by throwing a hand-held radio. Mr. Ray denied this.

On February 1, 1991, Mr. Ray was suspended with pay as a result of the incident. On March 28, 1991, he was told that he would be suspended without pay for 60 days commencing March 15, 1991.

On April 15, 1991, Officer Ray filed a charge of discrimination. Upon the expiration of the 60 day period of suspension without pay he was not allowed to return to work.

---

1. The Court uses "blacks" and "African Americans" interchangeably attempting to use the designation preferred by a particular witness or used in particular exhibits.

On May 17, 1991, he learned that he had been discharged effective May 15, 1991.

On May 23, 1991, Officer Ray filed another charge of discrimination with the EEOC setting out the above sequence of events. In that charge he stated, "The Chief of Security told me that it was not safe for me to be on campus" and that he was "denied the right to file a grievance or to pursue the matter of my suspension internally." He charged that he was discharged because of his race and in retaliation for filing the discrimination charges.

Mr. Ray's EEOC charge resulted in a "Negotiated Settlement Agreement," See Plaintiff's Exhibit 2, pursuant to which he was reinstated with no direct financial loss. Part of the settlement required the posting of a Notice which states *inter alia:*

> Federal law requires that there be no discrimination against any employee or applicant for employment because of race, color, sex, religion, national origin or age with respect to hiring, firing, compensation, or other terms, conditions, or privileges of employment. Federal law also requires that there be no retaliation against any employee or applicant for employment because of having filed a charge or given testimony during the investigation of a charge.

> The University of Arkansas at Pine Bluff supports and will comply with this Federal law in all respects, and will not take or permit any action against any employee because of their race. The University of Arkansas at Pine Bluff has an Equal Employment Opportunity policy and will ensure that all employees abide by the requirement so the policy.

> In settlement of the charge of discrimination which was filed, the former employee has been returned to his job with all benefits of employment restored, and he has been paid back pay.

Mr. Ray went back to work with defendant on September 23, 1991.

As part of the Settlement Agreement, the defendant agreed:

> To remove from its records and files any notation, remarks or other indications that

the Charging Party was suspended and discharged and that his performance was other than anything less than satisfactory. A statement will be placed in the Charging Party's personnel file affirming that he was found not to have committed the infraction he was accused of committing.

\*      \*      \*      \*      \*      \*

> That it will not retaliate against the Charging Party for having filed a charge of discrimination.

\*      \*      \*      \*      \*      \*

> The parties agree that this Agreement may be specifically enforced in court and may be used as evidence in a subsequent proceeding in which any of the parties allege a breach of this Agreement.

On December 9, 1991, a number of young men with weapons appeared on the UAPB campus firing indiscriminately. In the ensuing foot chase Officer Ray returned gun fire aimed at him and shot and killed Mr. Andre McNeal, a young black man. Following customary procedure he was placed on administrative leave with pay pending a police investigation. On January 31, 1992, Mr. Wayne Matthews, Jefferson County Prosecuting Attorney issued his finding concluding that Officer Ray was justified in his use of deadly physical force and also ruled the homicide "justifiable." Officer Ray returned to work February 3, 1992. Some three weeks earlier on January 10, 1992, Mr. Ronnie Grice was appointed Director of Public Safety. He had previously worked at the Jefferson County Sheriff's Office.

This lawsuit focuses on events which occurred between February 3, 1992, and January 29, 1993, the date Chief Grice recommended that Mr. Ray be terminated.

### The Present Controversy

Soon after becoming the head of the Department of Public Safety, Chief Grice became aware of the May 23, 1991, EEOC charge filed by Mr. Ray, the facts and circumstances underlying it, and of the September 26, 1991, settlement agreement. Interestingly, Sgt. Arthur Rodgers felt it important to visit with the new Chief shortly after Grice came on board to explain why he had

filed an affidavit supporting Officer Ray's EEOC charge.

In early July 1992, Chief Grice held a meeting with his sergeants. Present were Sgt. Davenport, Sgt. Russell and Sgt. Rodgers. The meeting lasted about one hour. The Court, having listened to the testimony of all who were present, finds that Chief Grice opened the meeting by stating that he had been waiting about a week to get something off his chest. Although the theme of the meeting concerned supervisory responsibility, Chief Grice spent a good portion of the hour castigating Sgt. Rodgers for his failure to control that "fucking Ray." That term was used frequently during the meeting in reference to Officer Ray. Sgt. Rodgers was asked why he could not control his shift and why he let Officer Ray do anything he wanted to do. When Sgt. Rodgers tried to defend himself by stating he in fact had no trouble controlling Ray, the Chief replied to the effect, "Damn it, you're not listening. You don't know this fucking Ray as I do." During that meeting Chief Grice also referred to Officer Ray as a "troublemaker" and, in fact, had used that same term to describe Ray several weeks earlier.

Chief Grice had served as head of the Department since January 10, 1992. He had had an opportunity to observe Officer Ray's work from February 3, 1992, (when Ray returned to work) until that meeting with his sergeants in early July—a period of approximately five months. So the Court asked itself: what had happened in that five month period to create in Chief Grice's mind such a strong negative reaction to Officer Ray?

For almost one month out of that five month period Officer Ray was off work. He had surgery on his knee the second week of May and was on sick leave until early June. After he came back he was on light duty—mostly in the radio room—for about thirty days. He resumed full duties and went back on patrol in July (even though his doctor did not give him a formal release for full duty until October 20, 1992).

So, starting February 3, 1992, the date Ray first worked under Chief Grice, what are the charges against Officer Ray? After Officer Ray had been notified that he had been terminated for "insubordination," Dr. Bobbie Irvins and Chief Grice on February 2, 1993, composed the letter (which Grice then addressed to Irvins) which purports to summarize the "complaints and charges" against Officer Ray.[2] That letter, dated February 3, 1993, (Plaintiff's Exhibit 39) can be used as a guide for a discussion of the various reasons given or suggested as the basis of the defendant's decision to terminate Officer Ray. The first three of these incidents occurred on February 13, 1992.

On February 13, Officer Ray was directed to check for parking violations. While doing so he found that the second loading zone on the South was blocked by a vehicle straddling the line to the extent that another vehicle could not get into the loading zone. As he started writing a citation, Mr. Shelton McGee, the Choir Director, came up, identified himself, and asked what Ray was doing. Officer Ray asked him to move his car into its proper parking space next to the loading zone. According to the "Follow–Up Report" prepared by Chief Grice, see Plaintiff's Exhibit 9, Mr. McGee advised Ray that if "someone had to unload in the zone he would be more than glad to move his vehicle for that purpose and return it to his parking spot." Mr. McGee reached the "conclusion that there was no reasoning with Patrolman Ray and returned to his office." Apparently no citation was issued. According to Officer Ray, Mr. McGee was upset, refused to move his car, pointed out that he had been with the University some 30 years, and would "have his job."

---

**2.** As the Court observed during the oral argument after the trial, the role of the Vice Chancellor, Dr. Bobbie Irvins in "reviewing" the recommendation of Chief Grice for Ray's termination is in question. The discipline protocol found in Plaintiff's Exhibit 8 calls for such "review." One might assume that this was to provide the employee (who had been recommended for discipline) some due process, i.e. on objective look by an independent superior official. Whatever the intent of the protocol, Dr. Irvins appears to have assumed the role of the co-prosecutor, reviewing the matter for the purpose of reinforcing the objective of Chief Grice: to find a way to fire Ray which would stand up.

Interestingly, Mr. Ray met with the University Chancellor that day to explain what happened. According to Mr. Ray, the Chancellor said he should do his duty and that "if you ever see me misparked you better write me a ticket."

According to Mr. McGee his vehicle was not parked in the loading zone. He testified that Ray was "a little hostile" but denied that he threatened Ray's job. This incident occurred in the morning. Mr. McGee used his automobile to go to lunch and when he returned parked it properly in his own designated space. That afternoon he contacted Chief Grice about the incident. Chief Grice went to the Fine Arts Building to discuss the matter. After their conversation the Chief and Mr. McGee went to the parking area. At this point Mr. McGee's car was properly and legally parked.

The Chief's report about the matter (plaintiff's Exhibit 9), which was never shown to Mr. Ray, is revealing on the issue of the location of Mr. McGee's vehicle when Officer Ray was writing the citation. To repeat, according to Chief Grice, Mr. McGee advised Ray that "if someone had to unload in the zone he would ... move his vehicle ... and return it to his parking spot." This is a clear admission of illegal parking. The Court credits Mr. Ray's testimony on this issue.

Chief Grice told Ray that he had received a complaint of his having been disrespectful to the Choir Director. When Ray attempted to explain the circumstances he was not allowed to do so. The Chief told him he would have to work on this attitude but did not suggest that he was conveying a "verbal warning" under the discipline protocol. Suffice to say, the Court can find nothing in the true facts which would merit censure. Of course, it is understandable that Chief Grice would be sensitive to any claim that one of his officers was disrespectful to a faculty or staff member. Nevertheless, if he had listened to Officer Ray's explanation he would at least have had a more balanced view of the incident. There is no evidence that Chief Grice had, before this incident, told Ray or others on his force that there was "separate standard" or policy of law enforcement with respect to faculty and staff. And from the highest level of the University administration—the Chancellor's Office—there came from this same incident a reaffirmation that no one is above the law. But Chief Grice's ambivalence on this point was evident when he testified that it was "not part of Officer Ray's job to get people upset over a $5.00 ticket" and that Ray should "use his common sense." By not listening to Ray's explanation the Chief was even unaware of the threat Ray states Mr. McGee made "to get his (Ray's) job." The tension between strict, even-handed law enforcement and "getting along" was evident through the trial.

The second incident which occurred on February 13, 1992, involved a woman student by the name of Rhonda Banks. At the direction of Captain Grice, Officer Ray was in the process of ticketing automobiles that were parked on the grass. As he was filling out a citation on a Mitsubisha, the driver came out of the building and entered the vehicle. The Court credits the report of Officer Ray and also his testimony at trial as to this incident. His report will be found at Plaintiff's Exhibit 10. He was clearly subjected to racial epithets and vulgarities and to physical responses which were completely unwarranted. Ray's response to the events described seem quite reasonable considering the difficult circumstances. Here we find an emotional, racial, response to a white officer's routinely issuing a parking ticket for a clear violation. Four days later Ms. Banks wrote a letter to Chancellor Davis. See Plaintiff's Exhibit 11. Two paragraphs from that letter will illustrate the racial animus aroused, viz:

> I had not infringed on anyone's privacy or livelihood, and as far as I was concerned, I merely wanted a reason for the emotional distress he had caused. At this point a close friend of mine rode by and jokingly yelled, "Rhonda, just pay the ticket." I summoned for him to come to the scene because the officer was threatening to take me downtown. As my friend approached he asked about the situation and I very negatively responded in reply. Officer Ray exploded and said, "That's it. You leave me no other choice but to place you under arrest" and proceed to bind my hands in cuffs. He explained that I was

under arrest because I had used profanity to refer to an officer of the law. As my friend tried to reason with the officer and literally BEG him to remove the cuffs, Officer Ray began to badger me with such remarks as, "If you were SO educated you'd know the law" and "since you don't know how to keep your mouth shut, I just lock you up!"

Tearfully, I responded, "Take me to jail. I'm already cuffed so why are we still talking? If you are going to take me, please do it now." I spoke these words while glaring deep into Officer Ray's eyes that were quite glib in appearance. By this time, a small crowd had gathered to witness the lack of professionalism being displayed by Officer Ray, and even though I was at the point of total humiliation and embarrassment, the only picture in my mind focused on Officer Ray's obvious pleasure in using his *white power* over a black woman on what *used to be* a proud African–American School.

I contend that Officer Ray acted very irratically (sic) and extremely irresponsibly during this circus of events. While my car was in an operating mode when he ordered me not to leave, Officer Ray had no legitimate or official justification to place handcuffs on me and treat me as if I were an *escaped slave being returned to the Massa's plantation*. What caused even more frustration was to witness the satisfaction on the face of Officer Ray while one of our black men had to bow and beg to this white man to gain mercy; the same Caucasian who, weeks earlier, shot one of our youths in the back in an apparent misdirected use of a firearm; in fact, when yet another young woman was being tormenting in her dormitory room, Officer Ray was probably making all feel a sense of security by fondling vehicles in the parking lot with his tickets. How can this man be allowed to represent the University of Arkansas at Pine Bluff. In light of our past problems and situations (financially and systematically), the last thing we need is to have *Bronco Billy* terrorizing the land with his unjust practices. (Emphasis in original)

Officer Ray was not shown a copy of Ms. Bank's letter until after this lawsuit was filed. Ms. Banks statement does not accurately reflect the facts. Mr. Ray's report, Plaintiff's Exhibit 10, does. Ms. Banks became upset and disorderly without justification. Mr. Ray reasonably sought to restrain her by putting a cuff on her left wrist. Once her friend took adequate control of, and responsibility for, Ms. Banks, Mr. Ray released her. Ms. Banks was not called as a witness.

It was not too many years ago that we saw similar racial responses as blacks sought and obtained access to law enforcement careers. Early on black officers were assigned to work with other black officers as assigned to work black neighborhoods to "avoid problems." This was completely unacceptable. With strong leadership it is possible to get by these way stations on the road to equal opportunity. The proper response was, and is, to back up and to defend professional and responsible law enforcement, regardless of the race of the officer. Failure to do so can make a minority law enforcement officer's position untenable, even dangerous.

Chief Grice later talked with Officer Ray about the Banks incident. He stated he received a complaint about the issuance of the ticket for parking on the grass. Officer Ray responded that the Chief had ordered him to ticket such vehicles. Chief Grice's response was in effect, "No matter. This is a problem about your attitude. You made a violent situation out of the issue of a parking ticket." He would not listen to Ray's response and explanation. But, of course, he did have Ray's report showing facts which are considerably at odds with the situation described in Ms. Banks' letter. From all that appears he made no effort to get to the bottom of the matter.

February 13 was a busy day for Officer Ray. A third incident involves his handling of a "loud music" complaint from Mr. Bonner, the Dorm Coordinator. There is an incident report by Captain Betty Griffin dated February 14, 1992, see Plaintiff's Exhibit 12, but it, too, was not shown to plaintiff until after the filing of this lawsuit. And the plaintiff was never disciplined or given any verbal warning as a result of this episode.

Both Ray and Captain Griffin responded to this particular call. According to Ray, who arrived first, the music, which was vulgar, was being played so loud you could *feel* the vibrations 100 yards away. There were four young black males around a red Ford Escort. Ray observed open containers of alcohol. When Ray first asked who the owner of the car was, no one answered. When he threatened to tow the vehicle one of the young men said he would get the owner. He went inside and returned with the owner. The music was then turned down. Ray asked the person claiming to be the owner for his driver's license and the car's registration. He had neither, so Ray called in the license plate numbers so that it could be checked through the Pine Bluff Police Department NCIC terminal. (Note: UAPB's police department did not have its own NCIC terminal). At this point Captain Betty Griffin said "Let's go. It's almost 3 P.M., time to go home." She insisted on dropping the matter. Ray suggested that they should check to see if the car had been stolen. Officer Ray has now read Captain Griffin's "incident" report dated February 14, 1992. He denies that the young men showed him proof of registration. He states he was shown a piece of paper concerning insurance coverage. He further denies that there was any report on the status of the vehicle received before Captain Griffin directed him to return to the office. Captain Griffin's reaction was essentially that Ray was making too much out of the situation. In the last paragraph of her memorandum she states she asked Ray to step aside and told him "that the subjects had cooperated and turned the music off and he should go to his next assignment." What prompted Captain Griffin to write the memorandum of February 14 is not clear, but the Court notes that a copy of it was forwarded to Chief Grice. There is no reference to discipline or to any warning contained in the memorandum. Such reports—non-accusatory, but nevertheless somewhat negative—concerning Officer Ray's conduct have surfaced several times during the trial. Since similar memoranda concerning other officers were not brought forth by the defendant, there is an inference that Officer Ray was being singled out for close and continuing scrutiny.

In her testimony at trial about this incident Captain Griffin stated that she responded to this call (in addition to Officer Ray) because Ray has an "attitude problem" when he approaches such a situation. So she thought it best to back him up. She testified that the students complained Ray was always harassing them and that as she approached he told one young man to "shut-up! I'm not talking to you." But, strangely, these observations are not found in her incident report of February 14, 1992.

The Court credits Officer Ray's description of the incident and sees nothing in his conduct that would call for censure, discipline, or warning. The description of this as a "complaint" of "harassment/intimidation" in plaintiff's Exhibit 39 is unfounded and the Court finds that no "verbal warning" was given to Ray as a result of the incident.

The "written warning" contained in a letter written by Chief Grice to the plaintiff on April 13, 1992, which refers to two other incidents, also refers to these "several complaints" as follows:

> As you know, back in February on or about the 17th or the 18th we met and talked about the changes that would have to take place in order for the department to function as a whole. There has been (sic) several complaints lodged against you. These complaints are not about your job performance, but your attitude. After meeting with you I was assured that this matter would not reappear again.

The next "Complaint" referred to in Plaintiff's Exhibit 39 has to do with the "unauthorized use of state vehicle." What is this all about?

On April 9, 1992, Officer Ray went to Rally's to pick up his dinner order. He took with him a female African American student who requested a ride. En route he called in on the radio. They rode to Rallys, picked up his order, and returned. He took his food into his official area to eat.

In the April 13, 1992, "written warning" Chief Grice reported on the incident as follows:

On Thursday, April 9, 1992, at 4:50 P.M. you left the campus to pick up dinner. That was fine because another officer was on duty at the time. The problem is you took a female student with you. This is against the rules in several ways. First liability, in the event an accident occur this would have to be justified to why she was in the vehicle. The only time females are transported is either to jail after they have been placed under arrest or to a medical facility, other than these reasons the department vehicles are used for official business only.

The Chief's description of the "rules" covering this incident does not accord with the proof. First of all there was no proof that such a rule limiting the use of University vehicles was ever adopted or posted. Plaintiff was unaware of any such posting. More important, the evidence reflects that "everyone did it" on a regular and routine basis, and the Chief was fully aware of the practice.

Ms. Lynda Wynn, Chief Grice's secretary, made a favorable impression on the Court. She did not recall the posting of any memorandum regarding the limits on the use of University vehicles. She testified all of the employees use the vehicles for lunch trips and private errands. She herself did it, and the Chief was fully aware because he would give her the keys to the car. And Sgt. Arthur Rodgers agreed. He knew of no posted rule on the subject and he was aware that officers frequently used the vehicles for such personal purposes, including Captain Betty Griffin and Sgt. Davenport, both of whom also took female friends along.

The Court is convinced that Officer Ray was unfairly singled out for discipline in this respect. All of which is not to say that there should not be a strict rule regulating the use of such vehicles. But if a rule is adopted it should be brought to the attention of all by posting and other means, and, then, it should be firmly fairly, and even-handedly administered. Otherwise it may be used as a trap and manipulated for discriminatory purposes.

The Plaintiff has brought forward evidence concerning the "Unauthorized Personnel Loitering" Memorandum put out by Chief Grice

on February 10, 1992. Found in the record as Plaintiff's Exhibit 7, it reads as follows:

Please be advised, Effective Immediately, no unauthorized (sic) person(s) will be permitted to loiter anywhere in the DPS Department.

Any DPS employee in violating (sic) of this demand will be dealt with accordingly. Your upmost (sic) attention regarding this matter will be appreciated.

Defendant claims all of the evidence concerning this matter is irrelevant because Officer Ray is not accused of violating this rule. But it is pertinent in showing how rules are handled in the Department. And it contrasts with the "Unauthorized Use of Vehicles" issue discussed above because, by contrast, here we have a clear rule. It is not, however, clear whether it was actually posted. But the main problem here is that the rule was simply not followed by anyone, as Chief Grice was aware. We will later contrast the enforcement of this rule with the "outside employment" rules that the defendant has relied on so heavily in its discharge decision. See discussion below.

Unauthorized people were in the defendant's offices on a daily basis. Students came to visit as did family members, girl friends, boy friends, whomever. And Chief Grice himself had such visitors and was well aware that his officers and staff members also had such visitors. There is no evidence that any one was disciplined for inviting such guests or that any were requested to leave. Again, Ms. Wynn, the Chief's secretary, testified that everybody had visitors, including herself and the Chief, and no one was disciplined for violating this "rule." Of course such rules may serve a purpose as "window dressing" even if there is no intent to enforce them.

The next "complaint" listed on Plaintiff's Exhibit 39, carries the date April 13, 1992, because that is the date of the "written warning" found as Plaintiff's Exhibit 14. However, the event referred to occurred on April 9, 1992, and involved a Mr. Jeffrey Falls [and not "Calvin Rachel" as erroneously referred in the warning]. The warning has this to say about the incident:

On Friday, April 10, 1992, at 3:15 P.M., Mr. Calvin Rachel, a student came by office in regards to a ticket you had written him the night before. This ticket was in reference to a traffic violation. Mr. Rachel advised me that you stated to him, get the necessary information and see the chief he probably would take care of this matter. With your (sic) present along with Mr. Rachel the situation was taken care of and subject matter was closed. At this point you begin to make the following statements to Mr. Rachel after the subject matter was closed, "Are you happy now, you got what you want, are you satisfied?" Mr. Rachel was becoming upset, but he maintain his composure.

The statements you made to Mr. Rachel was unnecessary, given that the matter was closed. Mr. Ray this will not be tolerated anymore. We have discuss (sic) your arrogant, intimidating attitude in February 1992. It was understood by both you and myself that this matter would not arise again. You assured me you would make every effort to correct this problem.

A report on this incident was made by Ms. Wynn and appears in the record as Defendant's Exhibit 18. What was the basis of this "complaint?"

On April 9, 1992, Officer Ray observed Mr. Falls going the wrong way on Kennedy Drive. He stopped him and started to give him a ticket. Mr. Falls asked if Kennedy Drive was not a two-way street now. He stated that he had read an article in a newspaper saying this was the case. Officer Ray told Falls that he did not think this was so but, if true, Mr. Falls should bring a copy of the article to Chief Grice and Grice would probably drop the citation. Although Falls was not pleased he accepted the ticket and went on his way. On the next day, April 10, Ray came into the office and found Falls and the Chief there. Falls showed the Chief the newspaper article and the Chief agreed the citation should be dropped. So far so good. Then the problem arose. It had to do with Mr. Ray's manner in responding to the situation. According to Ms. Wynn and the chief, see Plaintiff's Exhibit 14 and Defendant's Exhibit 18, he asked Mr. Falls, "Are you happy now, you got what you wanted, are you satisfied?" Both felt Ray's manner was arrogant and intimidating. The Court accepts that Mr. Ray did not intend to convey such impressions. After all it was he who suggested to Mr. Falls to take up the matter with the Chief based upon the newspaper article. Nevertheless, the Court accepts the Chief's judgment that Ray's tone on this occasion was arrogant and intimidating and that Ray was not as sensitive to the situation as he should have been. In fact the Court accepts that Officer Ray on occasions comes on strongly. For Police Officers there is always the need to be firm. But there is also the need to be polite and courteous. Ms. Wynn, speaking of Ray, observed, "That's how he talks. That's just Kenny." But she was equally insistent that Mr. Ray never exhibited a racial attitude and that he had no problem taking instructions or directions from his black superiors.

The next complaint listed on Plaintiff's Exhibit 39 has to do with an alleged "Unauthorized Memo." To the court this appears to be an excessive and unusual response to the handling of a rather routine problem. And, as such, it lends support to plaintiff's contention that Officer Ray was being subjected to different terms and conditions of employment than his fellow officers. What are facts?

Ms. Carolyn Walker, a tutor with the computer center complained about the problem of getting Caldwell Hall unlocked so that students could work on the computer on the weekend. She asked Officer Ray's help. He assured her he would make every effort to take care of the problem. He asked Captain Jones how best to handle it and was told to write up a memorandum specifying the dates and times the building should be opened and to bring the memo to him, Jones. Ray wrote out such a memo, got Jones to sign it, and then gave it to Ms. Felicia Williams to type up for posting. She typed the memo as it appears in Plaintiff's Exhibit 17 addressing it to "7–3 shift and 3–11 shift" from "Ronnie Grice, Director/Chief, Harvey Jones, Captain," reference "unlocking buildings." The full text is as follows:

Carolyn Walker has requested Caldwell Hall to be open at the folling (sic) date and times, to ensure her student workers access to the computer center.

The dates and times are as following:

Saturday, June 28, 1992 07:30 am—13:00 pm

Sunday, June 29, 1992 12:30 pm—18:00 pm

Your full cooperation in the matter is highly appreciated.

Thank you.

The initials (RG:HJ:fw) at the bottom suggest that the memo was dictated by, or originated by, the Chief and Captain Jones.

The problem arose while Chief Grice was out of the city. The court credits Officer Ray's testimony that his hand-written memorandum did not mention Chief Grice but was signed by Captain Jones before he gave it to Mr. Williams. In this respect the Court observes that if Chief Grice was the only one who could authorize this action, Captain Jones' name was unnecessary and there would have been no reason to add his name. However, if Ms. Williams received the hand written memo signed by Jones but felt the Chief's name was also needed then that might account for her decision to put both names on the memo. This would be consistent with the designation: "RG:HJ:fw." This all occurred on Friday, June 26, 1992, while Officer Ray was working light duty on the 7 a.m.—3 p.m. day shift. Officer Ray does not recall if the memo was posted before he got off at 3 p.m.

The background to this incident is important. Officer Ray testified that from the time he was hired in 1989 until June 26, 1992, these problems were handled on a much more informal basis. Requests by the proper authority to have a building opened on the weekend were usually made to, and handled by, the radio room, but the week before Sgt. Davenport had refused to comply with a similar request by Ms. Walker. So to be sure that there was no problem Captain Jones agreed that he should sign the memo.

Officer Ray did not know that there was a problem until the following Monday or Tuesday, June 29 or June 30, 1992. At that time Chief Grice called him in, showed him the memo, and asked what he knew about it. Officer Ray related the above account and told the Chief that he did not put the Chief's name on the memo. He tried to tell the Chief how such situations had been handled in the past, but the Chief's response was, in effect, "Never mind. In the future there will be no more such memos without my signature."

Officer Ray did not see Plaintiff's Exhibit 18, Plaintiff's Exhibit 19, Plaintiff's Exhibit 19A or Plaintiff's Exhibit 20 until after this lawsuit was filed. The Court credits officer Ray's testimony about this incident. The Court also notes that the memorandum of Lynda Wynn, written on July 6, 1992, concerns a different situation involving the unlocking of the *Library*. From the evidence and the inferences arising therefrom the Court finds that Plaintiff's Exhibit 18 and Plaintiff's Exhibit 19 and 19A were written at the direction of Chief Grice.

Here we have a situation where everyone agrees that the Department should be helpful and forthcoming in complying with proper requests that buildings be opened as needed on the weekends. Until Sgt. Davenport balked on such a request the week before no one appears to have been concerned about the protocols or the formalities. The idea was to assist with, and comply with, such legitimate requests. So when such a request was made to Officer Ray at a time when the Chief was out of town he attempted to deal with it on the assumption that that is exactly what the Chief would want done. That was a reasonable assumption. Officer Ray obtained the approval of the highest ranking officer present. So why the big flap and all of the memoranda writing?

The Court believes that the Chief's discussion with Officer Ray on Monday June 29 was the precipitating event causing him (Ray) to file the EEOC charge of June 30, 1992. And the Court finds that the "unauthorized memo" incident reveals an animus against Officer Ray and is an example of the disparate treatment he received while working at UAPB after his return to work on February 3, 1992.

The next "complaint" listed in Plaintiff's Exhibit 39 deals with an alleged incident of "job abandonment and insubordination" on the part of Officer Ray. This incident which in the end came to nothing is nevertheless further evidence that Mr. Ray was being treated differently than his fellow officers all of whom were black.

Plaintiff's Exhibit 28 refers to the incident but a copy thereof were not seen by plaintiff until after this lawsuit was filed. So what occurred on December 9, 1992?

Officer Ray made a suspicious vehicle stop and check. When he approached the vehicle 3 or 4 females who had been lying down got up, laughed and carried on. Officer Ray asked to see the operator's driver's license. Officer Walton then arrived to assist. They smelled alcohol. A crowd formed and became loud and hostile. Sgt. Davenport radioed inquiring what was taking so long. Officer Ray told the Sergeant about the situation and that the crowd was hostile and used derogatory racial statements. Sgt. Davenport directed Officer Ray to go to and stay in the radio room. Officer Ray felt that he would be in more danger in the radio room and stated he would rather continue on patrol. Davenport would not permit this so Ray said he needed to leave the radio room for his own protection and would charge it to sick leave if need be. Thereupon Sgt. Davenport said, in effect, "do what you have to." So Officer Ray left between 2:30 and 3:00 a.m.

Defendant's Exhibit 37 is a letter from Sgt. Davenport to Captain Betty Griffin dated December 9, 1992, re "Insubordination and Job Abandonment." It does not appear that plaintiff saw this document before filing this lawsuit. However, Captain Betty Griffin discussed the matter with Officer Ray a few days after January 6, 1993. According to Officer Ray she told him that she had talked to Sgt. Davenport and Officer Walton and concluded that Ray had not abandoned his post and that he left with the sergeant's permission. She did not say anything about any warning or other disciplinary action.

This is interesting because Captain Griffin's letter to Chief Grice dated January 6, 1993,[3] states in part, as follows:

> Patrolman Ray knows that no one is to leave his or her assigned post without getting the necessary approval from his or her supervisor.
>
> After listening to all of the parties involved, the supervisor, Sergeant Davenport was not direct and precise in making a decision. Because of the supervisor actions taken regarding this December 9, incident, I am recommending that Patrolman Ray receive a written warning for leaving his post.
>
> Your approval to this recommendation will be appreciated.

It is clear that Captain Griffin realized that, at best, Sgt. Davenport's comment to Ray that "he should do what he had to do" was either an approval of Ray's request or ambiguous. Given her finding that Davenport "was not direct and positive in making a decision," it is difficult to understand why she should recommend that Ray receive "a written warning for leaving his post." Ray was never informed of this recommendation, nor apparently, did Chief Grice ever act thereon. But this paper nevertheless hung around in Ray's file until February 2, 1993, when Chief Grice and Dr. Irwins decided that they in fact evidenced insubordination and job abandonment.

Plaintiff's Exhibit 8 sets forth certain of the provisions found in the *Employee Handbook* including pertinent sections setting forth the University's "Progressive Discipline Policy." The characterization of the challenged conduct can have immense consequences. Offenses are classified in categories I through V with the most serious infractions being listed in category V. Under category II we find, *inter alia,* "Unauthorized absence from work area." Under category V we find the offense of "Job Abandonment" listed. For a "first occurrence" of unauthorized absence the penalty is a written warning. This is the punishment recommended by Captain Betty Griffin for Mr. Ray. A

---

**3.** The Court notes that Chief Grice became aware of the EEOC's favorable (to UAPB) ruling on Ray's June 30, 1992, charge sometime early in January, 1993. It appears to the Court that this development opened the door to a more overt effort to get rid of Officer Ray.

second such occurrence would call for "Probation;" a third for three days without pay. Not until the fourth such occurrence would discharge be the penalty. Compare that with the penalty for "job abandonment" under category V. Here the first such occurrences calls for discharge!

The Court has already made clear that the true facts of the incident would not have warranted any discipline of Officer Ray under either the "unauthorized absence" category or the "job abandonment" category. And, indeed, no discipline was administered against Ray as a result of the incident and he was never even made aware that Captain Griffin had recommended a "written warning" be given Ray "for leaving his post." And, despite all of this, on February 2, 1993, we find Captain Grice and Dr. Bobbie Irvins escalating this record into one of the four "insubordination" complaints against Ray as set forth in Plaintiff's Exhibit 39.

We move now to the next "insubordination" complaint as set forth in Plaintiff's Exhibit 39, to wit, the claim that Mr. Ray failed to follow instructions and obey orders to attend and assist the Cashier's Office during a peak period when checks were being issued to students. Apparently Ms. Eula McRae Liddell in the Cashier's Office was the one who requested such assistance on January 14, 1993. Her memorandum to Chief Grice, dated January 22, 1993, is found in the record as Plaintiff's Exhibit 29. Mr. Liddell did not testify at the trial.

Officer Ray's explanation of the events of January 15, 1993, is as follows: On that morning he was assigned by Captain Betty Griffin to keep cars off the grass at all cost. During check-distribution and registration periods this was a big problem because cars could get stuck. That same morning Captain Griffin assigned Sgt. Davenport to the parking lot around the main administration building and told him to keep an eye on the lines of students to be sure they did not become unruly. Sgt. Davenport nodded, got the keys to his patrol car and left. However, instead of going to his assignment, Sgt. Davenport drove around in his vehicle with a student worker. Next, Officer Ray states he heard Captain Griffin call for Sgt. Davenport at

least 3 times. The first time he answered she told him he needed to go to administration building to help with the lines. The next two times Captain Griffin attempted to contact Davenport she was unsuccessful. Officer Ray in the meantime had come to Ms. Wynn's office to get his check. Seeing him there Officer Griffin said she could not find Davenport and directed Ray to see about the line at the cashier's office. There is some evidence indicating that Officer Ray was not happy that he was being ordered to take care of Davenport's assignment. He delayed briefly until Captain Griffin renewed her instructions. While there is no excuse for Officer Ray not to promptly obey such a direction, the five or ten minute delay is really not what Officer Griffin is complaining about here. Rather, her complaint is that Ray after leaving the office did not go promptly to the cashier's office to oversee the line. Apparently an accident occurred involving a tractor-trailer and parked automobiles on Kennedy Drive which required Ray's immediate attention. He radioed back to advise it would be awhile before he could work the cashier's office. But he also took a moment to check the lines in that office before returning to the accident. At that point there appeared to be no problem with the lines.

By the time Officer Ray got to the Cashier's line assignment, Captain Griffin was already there and she was greatly upset that Officer Ray had not promptly carried out her instructions. She asked why it took him so long and he told her about the accident problem. She stated the cashier's office had called back several times and that she finally had to go herself.

On January 22, 1993, Captain Betty Griffin wrote a memorandum to Chief Grice re "Insubordination" setting forth her view of the events of January 15, 1993, and recommending that two weeks be deducted from Ray's pay. She obviously did not accept Officer Ray's excuse about having to attend to the accident. In any event the Court credits that Captain Griffin sincerely felt that Officer Ray had not carried out her orders. And the testimony of Ms. Wynn also convinced the Court that, even though Officer Ray was

diverted by the accident, he did not respond to Captain Griffin's orders as he should have.

But the problem is that neither Captain Griffin nor Chief Grice ever told Ray that they considered him insubordinate because of this incident or that they were going to recommend his discharge for failing to promptly carry out Captain Griffin's orders. And even in Plaintiff's Exhibit 30 Captain Griffin does not recommend discharge which, under the discipline protocol, is the *only* sanction for "insubordination." Clearly she did not view Officer Ray's conduct as meeting the protocol's definition of "insubordination." And one can only ask: why was Officer Davenport not disciplined for his failure to carry out Captain Griffin's orders? There is a double standard here.

This record shows that no black officer has ever been discharged during Chief Grice's tenure. In fact the only person to be fired is the only white officer on the force, Mr. Ray. But this is not to say others have not engaged in more serious offenses than those attributed to Mr. Ray. Take the case of Officer Christopher Taylor. In a memorandum dated April 23, 1992, to Chief Grice, Captain Betty Griffin describes an incident as follows:

> On April 20, 1992, approximately 4:45 PM, there was a disturbance in the hallway of Childress Hall. The subject got very hostile and refused to cooperate. I (Betty Griffin) then had to place the subject under arrest. While trying to retain the subject, we got into a wrestling match. Several other subjects gather around and were interferring (sic) during the arrest. Officer Christopher Taylor who would not assist in trying to remove some of the subjects, just stood in a daze. I then advise him to get some of the subjects out the door, but he did not.
>
> Officer Taylor duties are to assists an officer in whatever situation that may require his assistance. If for some reason Officer Taylor cannot carry out his responsibility, we need to be aware of it. An assisting fellow officer is very vital in this department.
>
> This is not the first time Officer Taylor has been reported for not assisting. There-

fore, I'm recommending that some disciplinary action to taken against him. I'm recommending that five (5) days Annual Leave be deducted from his time.

It is difficult for the court to conceive of a more serious act of insubordination. For an officer to fail to obey a direct order to assist a fellow officer in such circumstances is almost impossible to understand. But what discipline did Captain Griffin order in this instance? That five days Annual Leave be deducted from Officer Taylor's time! And note that Captain Griffin states, "This is not the first time Officer Taylor has been reported for not assisting." And how did Chief Grice respond to Captain Griffin's recommendation? See the letter of Grice to Taylor dated April 24, 1992, Defendant's Exhibit 21, wherein he advises Taylor, "The disciplining action that will be taken against you will be the lost (sic) of three (3) days of your Compensatory time."

It is clear that Officer Ray has been subjected to different, and more severe, discipline and oversight than have his fellow officers.

When the Court asked Captain Griffin to explain what appeared to be an egregious difference in the handling of the *Taylor* matter and the *Ray* incident, the colloquy referred to at the beginning of this opinion occurred. She explained by stating that Officer Ray as a "minority" thought "he could do what he wanted to" and that he "was showing me you can't tell me anything" and that he "thinks he can get away with anything." There is a racial undercurrent here that is hard to ignore.

There is another issue here that cannot be avoided. Officer Ray testified that Captain Griffin appeared to have a drinking problem. He stated that she would smell of alcohol as few times as twice a month to as often as 8 or 10 times a month. And he states that Chief Grice was present and should have observed the situation. The Chief would usually leave work around 5 p.m. But even when Captain Griffin was not on the day shift she would come in at 3 p.m. On some of these occasions, according to Officer Ray, Captain Griffin was under the influence of

the alcohol. Ray actually commented to her several times about the situation. Captain Griffin denied that she ever came to work under the influence or with the smell of alcohol on her breath. But then she stated in her testimony at this trial—apparently for the first time—that *Ray* came to work under the influence on several occasions and at least two of these occasions occurred after Grice became Chief. Captain Griffin was Ray's superior officer and she admits she never wrote up Ray for such a clear violation. "Reporting to work under the influence of alcohol" is a Category III offense under the University's discipline protocol. And, of course, for a police officer to be under the influence while on duty has far more serious potential consequences than would be the case if the person involved were a teacher or a member of the non-uniform staff. The court felt it important to attempt to find the truth with respect to what otherwise might appear to be a side issue because here the truth would not only bear directly upon the credibility of key witnesses but also upon the rigor, or lack thereof, in the defendant's system of discipline for its police officers.

What do the other witnesses say about this? The Court has already observed that Ms. Lynda Wynn, the Chief's secretary, made a very favorable impression upon the court. Her testimony did not appear to be pitched or slanted for or against anyone. She stated that she observed that Captain Griffin had been drinking alcohol several times. On one of those occasions, when Officer Ray was also present, she observed Captain Griffin staggering. Ray walked out but Wynn then told Captain Griffin, "you smell like you have been drinking a lot." Captain Griffin responded, "I do?" Ms. Wynn then gave the Captain some mints. When Ray returned his observation was, "Uh? So you can come to work drunk?!" Ms. Wynn testified that the same thing occurred the following day so she mentioned the problem to Chief Grice. Nothing happened. But the problem kept reappearing. After some 6 to 8 separate occasions she again approached the Chief and said "Something needs to be done." Yet Chief Grice never disciplined Captain Griffin for the conduct.

Officer Larry Walton also testified that he observed Captain Griffin staggering under the influence twice and several times smelled alcohol on her breath. He was not sure if the Chief observed this and felt "intimidated" to say anything about it. Sergeant Rodgers also testified he observed Captain Griffin with the smell of alcohol on her breath and on one occasion she stumbled and caught onto his shoulder. He gave his opinion that she was impaired and "would have flunked a field sobriety test." The court felt Sgt. Rodgers to be a very credible witness although he was clearly a Ray partisan, describing him enthusiastically as a "great" police officer.

Several of the witnesses for the defense stated they did not observe Captain Griffin under the influence and one, Sgt. Russell, stated he did smell alcohol on Ray's breath and that Ray's speech was slurred. But he did not report it or initiate any discipline.

The court credits Ms. Wynn, Sgt. Rodgers, and the plaintiff on this issue and finds that on many occasions Captain Griffin was at work with the smell of alcohol on her breath and on more than a few of such occasions she was impaired from the use of alcohol. The Court also finds that Chief Grice was made aware of the situation but failed either to discipline Captain Griffin or to insist upon her getting professional assistance for the problem. The Court also finds that Officer Ray was never under the influence of alcohol while on duty. This finding is reinforced by the conclusion that the defendant would have disciplined Ray and made a written record of any such behavior as it did in recording so many inconsequential, trivial or baseless complaints against the plaintiff. These findings also reinforce the overall conclusion that discipline was not administered in a fair, consistent, and even-handed manner when it came to Officer Ray.

We come now to the final complaint listed against Officer Ray in the letter to Dr. Bobbie Irvins from Chief Grice, reference "Termination of Patrolman Kenneth Ray" dated February 3, 1994. Plaintiff's Exhibit 39. The complaint is characterized as: "Insubordination—Failed to Notify supervisor of outside employment." And it must be recalled

that this incident was the *only* one identified specifically in Plaintiff's Exhibit 34, the letter dated January 27, 1993, from Chief Grice to Officer Ray, reference Ray's termination. What is it all about?

It is clear from the evidence that police officers employed by UAPB have been permitted to take outside work so long as it did not interfere with their jobs or official duties. This general policy has been in effect at least since Officer Ray was employed by UAPB in 1989. It apparently is still in effect. No written general policy regarding outside employment was ever adopted or published by the UAPB Department of Public Safety prior to the incident involving Officer Ray.

The evidence makes it clear that the subject of outside employment was dealt with on an informal, inconsistent, and ad hoc basis.

Captain Griffin testified that Chief Grice discussed the problem of outside employment sometime in mid–1992. He decided that notice of such employment should be given to him or to the officer's supervisor. But he apparently recognized an exception for work on private events conducted off campus by organizations that were recognized by the University such as fraternities and sororities. At one point in his testimony Chief Grice seemed to be drawing a line between establishments that permitted alcoholic beverages and those that do not. But in most of the situations described by the witnesses, the events were University organization parties at which alcoholic beverages were served. In sum, there was no definite Department of Public Safety general policy on the subject. But starting around mid-July 1992 Chief Ray began focusing on Officer Ray's outside work. He states that this followed an incident at P.J.'s Disco at which a police officer from the City of Pine Bluff and Officer Ray were shot at while working there. Chief Grice spoke to Ray about the matter and asked Ray to provide him with a list of places where he worked. He directed Captain Griffin to follow up on this and obtain such information from Ray. And on September 23, 1992, at the specific instructions of Chief Grice, she wrote a letter, see Plaintiff's Exhibit 22, which states:

On several occasions you have been advised by Chief Ronnie Grice and myself to bring in verification from your outside employment.

As of September 22, 1992, I have not received a statement or form regarding the above request. This is a written warning, if you fail to bring in the necessary information by Thursday, September 24, 1992, there will be some disciplinary action taken.

The Court finds that before Captain Griffin wrote the letter of September 23, 1992, she made an oral request for information about Ray's outside work and he responded by writing a note to her explaining the situation in early September and a follow-up note on September 21, 1992. See Plaintiff's Exhibit 23. When he thereafter received her letter he asked her why she wrote the letter, pointing out that he had already complied. She responded that, yes, she had received same and that Ray should disregard her letter. No action was thereafter taken, or complaint made, for Ray's failure to comply with Captain Griffin's letter. Further on October 7, 1992, Officer Ray delivered a handwritten "Request for Clearance" to work outside employment directly to Chief Grice. He was aware that the Chief already knew of most of the places where he had worked but he had recently learned of a new opportunity to work at Pineywood Apartments. In his request he stated:

Occasionally I am offered the opportunity to work security at other establishments, P.J.'s nightclub or Pineywood Apts. I have not worked for P.J.'s in a few months now nor do I intend to work there again, however I would like permission to work security for Pineywood Apts. if given the opportunity. I would also like to know if it will cause any complications if I accept other work as long as it does not interfere with my work at U.A.P.B.

The Chief replied to Officer Ray's request by letter dated October 23, 1992, see Plaintiff's Exhibit 25, which reads in part as follows:

Per your request, outside employment at Piney Wood's Apartment has been approved. Per our last meeting and your written request for outside employment,

you stated you no longer work for P.J.'s Disco and Georgia Street Ballroom.

In the future, if any outside events come up that you might have an interest to work, a request must be submitted to your supervisor ten (10) days in advance prior to the event.

This was the last instruction that Ray received on the subject. After receiving this, the matter was never further discussed by Ray with Chief Grice before January 29, 1993. No one told Ray that he had to apply in writing or that such requests should be directed only to the Chief. On the contrary the specific directions of the Chief to Ray were that "a request be submitted to your supervisor ten (10) days in advance of the event."

Several comments and additional findings are required. First, Captain Griffin's letter of September 23, 1992, was inaccurate in stating that she had "not received a statement or form regarding the above request," and, therefore, no "written warning" was appropriate. Secondly, and more important, this sequence of events shows how differently Mr. Ray was treated with respect to outside work than other employees of the defendant who were similarly situated. Such demands were not made on other officers for similar information and, although the Chief started in the fall of 1992 to ask, on an ad hoc basis, that certain oral requests be reduced to writing, no other officer was required to submit such a request ten days before the event.

The Court notes Plaintiff's Exhibit 21 and Plaintiff's Exhibit 26 as illustrations. On August 16, 1992, Officer Larry Walton wrote a note to Chief Grice requesting permission to work at LaVashes from that date (August 16) until the end of the year. He planned to work that very night. The request was approved by the Chief on August 17, 1992. On November 7, 1992, Officers Larry Walton and Leon Harrison asked "permission to work the Homecoming Dance tonight at Townsend Park." It was approved that same day. So, even though the Chief only two weeks earlier (October 23, 1992) had advised Officer Ray that any such requests must be submitted ten days in advance, he is here applying a different standard to his black officers.

P.J.'s Disco is a night club, the rear half of which is a dance floor and the front half of which is occupied by a bar and pool tables. Occasionally the owner, Mr. Perry Johnson, simply rents the facilities to others. Sometimes P.J.'s provides the staffing and sometimes the renter makes those arrangements. On some date before the middle of January 1993, the Alpha Kappa Alpha sorority rented P.J.'s facilities for a party to be held on Saturday night, January 23, 1993, and agreed to arrange for the staffing. The Sorority contacted Officer Michael Jenkins of the Pine Bluff Police Department to arrange for security. Jenkins in turn asked Officers Ray and Walton to assist him. It was Jenkin's custom to call officers with UAPB Department of Public Safety to assist when University organizations rented P.J.'s.

In making arrangements for the January 23, 1993, engagement, Officer Jenkins called Officer Ray on the telephone on either January 11 or January 12. In the room with Ray were Captain Jones, one of Ray's superior officers, and Officer Walton. Jenkins asked Ray if he would be available. Walton hearing the conversation asked Ray to find out if Jenkins needed another officer. Jenkins said yes. Then Ray asked Captain Jones if he had any problem with their working the sorority dance on January 23 and Jones replied, "No, if it doesn't interfere with your work here."

So it is clear that Officer Ray complied with Chief Grice's letter of October 23, 1992, by submitting his request and getting approval from his supervisor over ten days before the scheduled event.

On Monday, January 25, 1993, at 8:30 a.m. a female student reported to Lt. Maple Finley an incident at P.J.'s on January 23, 1993, in which she claimed Ray hit her for no reason. See Grice memo captioned "Follow–Up Investigation; Complaint: Assault; Suspect: Kenneth Ray." That memo further reveals that Chief Grice interviewed Perry Johnson, the owner of P.J.'s and found that Michael Jenkins, Kenneth Ray and "a new officer he did not know by name" worked the

event on Saturday, January 23, 1993. The other officer was Larry Walton.

At around 2:00 p.m. on January 29, 1993, Chief Grice met with Officer Ray. He first discussed the Kacy Higgins complaint, see infra, and then turned to the subject of Officer Ray's having worked at P.J.'s on Saturday, January 23, 1993. See Plaintiff's Exhibit 35 and Defendant's Exhibit 41A. It must be kept in mind that Chief Grice had already, no later than January 22, 1993, decided to recommend plaintiff's termination.

Chief Grice asked Ray when he last worked at P.J.'s and Ray replied he had worked there recently once or twice. The Chief asked if Ray had worked there on January 23, 1993, and Ray responded that he worked that weekend but would need to see a calendar to be sure of the date. The Chief then told Ray he had verified his working that evening at P.J.'s by talking to Mr. Perry Johnson. The Chief asked if Ray struck a female. Ray denied it. What had happened at P.J.'s on that Saturday night?

There is a canopy over the entrance area at P.J.'s that is large enough to accommodate approximately 25 persons. That night it was raining and about 100 persons tried to squeeze under the canopy. A lot of people from the general public arrived not knowing that P.J.'s was rented for a private party. This increased crowd caused the problem. The officers had to push the people back to keep them from breaking in. Chief Grice then told Ray he was satisfied from his investigation that any contact with the girl was only incidental and that Ray had not struck her. But then Grice told him that he was insubordinate because Ray had not told him that he would be working at P.J.'s. Ray responded that he had cleared it with his superior officer, Captain Jones. Grice then hit his fist on the table and said in effect, "I don't care. You're supposed to tell me." Ray told the Chief he was unaware of any such policy and thought he was following directions by clearing the request with Captain Jones. It was at this point that the Chief handed Ray the letter dated January 29, 1993, re: "Termination of Patrolman Kenneth Ray." See Plaintiff's Exhibit 37. Ray read it. He was shocked and surprised

and in a state of disbelief. When he composed himself he asked, "When do I stop work?" the Chief's reply was, "As soon as you walk out that door you are through. Don't come back." Ray then asked the Chief if Larry Walton knew he was being fired and the Chief's reply was "Don't worry about that. I'll take care of it." This was Ray's last conversation with the Chief.

What did happen to Larry Walton who also worked at P.J.'s on January 23, 1993? On February 4, 1993, Mr. Larry Walton received a letter from Chief Grice re: "Suspension without Pay." See Plaintiff's Exhibit 40. It states that "because of your involvement on January 23, 1993, regarding working outside employment at P.J.'s Disco without approval" that "One (1) of your two (2) weeks vacation will be taken from you." That letter goes on to say that "if you would have followed the instructions for working outside employment (Officer's should contact Chief Grice for two (2) weeks prior to event he or she desire to work for approval) this action would not have taken place."

First, the court would assume that if failure to follow instructions constitutes "insubordination" in Ray's case, it should also in Walton's case. This is not to suggest that either incident would merit such a charge. Clearly neither would. Secondly, the Court notes that no "instruction for working outside employment" as described in the letter to Mr. Walton was given or published before January 24, 1993. It is true that on an ad hoc basis Officer Walton had been told on earlier occasions to put his requests in writing (contrary to the instruction given Ray), but Walton had never been informed of any "waiting period," two weeks or otherwise. And his earlier written requests were submitted on the very day that he was to work the event. See Plaintiff's Exhibit 21 and Plaintiff's Exhibit 26.

What justification does the defendant offer for the gross difference in the penalties imposed on the two officers for working at P.J.'s on January 23, 1993? The Chief now says that Walton tried to request permission by sliding such a request under his door on January 23, 1993. However, there is a question whether he was even aware of this when

he imposed the penalty on Walton on February 4, 1993. Furthermore, this would not have met the "instructions for working outside employment" which he sets forth in his letter to Walton, i.e. that officers "should contact Chief Grice two weeks prior to the event ... for approval." The Chief also points out that Officer Ray was the older, more experienced officer and that Ray was forewarned. He further states that Walton had no serious prior problems. But fairly and objectively evaluated neither did Ray. The Court sees no explanation of this differential in treatment other than race and retaliation as claimed by the plaintiff.

One of the ironies here is that Walton appears to have been penalized (however mildly) in an attempt to deflect the disparate treatment argument that had been so forcefully brought to the attention of Chief Grice by his secretary Ms. Wynn. The Court concludes that Walton would not have been disciplined at all for working at P.J.'s on January 23, 1993, had not Chief Grice been determined to terminate Officer Ray.

The only non-listed reason (i.e. not listed among the complaints and charges on Plaintiff's Exhibit 39) for terminating Officer Ray that merits discussion arises out of an incident involving a Mr. Kacy L. Higgins on January 17, 1993. See Defendants Exhibits 38, 39, 40, 41, 41A and 42. Chief Grice states that Mr. Higgins came to his office on Monday January 18, 1993, looking for items taken from his vehicle on the day before. He states that at that time he did not find a report of the incident or a confiscation report. Chief Grice then conducted an investigation of the incident.

Chief Grice acknowledged in his testimony that he had already decided to terminate Officer Ray before he completed his investigation of this incident. The Court is skeptical as to the objectivity of the "investigation." Chief Grice states that he called upon Investigator Terry Morrison of the Arkansas State Police to assist in the investigation but the undated "Investigative Summary" was admittedly written by Chief Grice. In issue was the credibility of Mr. Higgins and Mr. McCullough on the one hand and of Officer Ray on the other. Mr. Higgins did not testify.

As to what actually happened at the Hazard Gym parking lot between noon and 1 p.m. on Sunday, January 17, 1993, the Court credits the testimony of Officer Ray which is in line with the second report which he wrote on the incidents. See Defendants Exhibit 38. In particular the Court credits Ray's statement that Charles L. "Herc" McCullough was not one of the two persons he dealt with during the incident. One was Higgins and the other was a person who identified himself as "Coach McNeil." Ray has seen Mr. McCullough before at P.J.'s and states he was not present during the incident.

According to Chief Grice, Mr. Higgins claimed that Officer Ray confiscated, among other things, $200 in cash and a wrist watch that was not returned. Ray denies this. What happened on Sunday January 17, 1993?

Officer Ray came across a "suspicious" vehicle parked in the Hazard Gym parking lot. Buildings on campus are usually locked on the weekends unless arrangements are made to open them. Students are not allowed to roam the buildings. The vehicle, a green Suzuki Samurai, was at the west entrance to the gym. The vinyl top had been lowered. The interior of the car was exposed to his view. He noticed an open 22 oz. bottle of Colt 45 beer and also an open package of JOB cigarette rolling papers on the front seat. He knew that such cigarette papers were frequently associated with marijuana use. He leaned in and then sighted on the floor small plastic bags that contained a green leafy substance resembling marijuana. He also found a green military "Ammo Can" on the rear seat which was filled with an assortment of unfired shotgun and rifle cartridges. He also found a sack of fireworks. There had recently been acts of vandalism damaging Hazard Gym so he started looking for the owner of the vehicle. After getting keys to the gym he went inside and looked about. After searching the ROTC area and the basketball court area he found two men in the very back Lakeside Annex area. One identified himself as "Coach McNeil" of the University's football team. The other later identified himself as Kacy Higgins. He

asked who owned the vehicles and Higgins said it was his. Officer Ray asked him to step outside and then advised Higgins what he had found in the car. Higgins stated, "You didn't find nothing in my car." Ray then asked Higgins if he knew how controlled substances could get in his car. Higgins claimed no knowledge but stated his cousin had used the vehicle "last night." During this conversation Ray spotted a burned, partially smoked, rolled cigarette in an open storage area in the dashboard. He pointed it out to Mr. Higgins and then put it in the bag with the previously removed evidence. Ray explained the seriousness of the situation. Mr. Higgins said he was a senior student and was just trying to make it till May. Ray advised that due to the possibilities that the evidence had been left by others and the small quantities involved and that Higgins was enrolled as a student and due to graduate soon, that he (Ray) would hold the evidence for a year. If during that period Higgins got into no other incident of this nature, then no charges would be filed.

Mr. Ray actually prepared a report that afternoon and left it in the radio room. When the Chief said he could not find the report, Ray prepared Defendant's Exhibit 38 and gave it to the chief on January 20, 1993. Ray has not seen the person who identified himself as "Coach McNeil" since January 17, 1993.

Mr. Ray assumed the incident was closed until Chief Grice called him at 5 p.m. on January 19, 1993, and told him that Higgins had claimed that Ray had taken $200 in cash. Ray mentioned this conversation with Grice in his report. Defendant's Exhibit 38. . He concludes his report by stating "There was never any money mentioned, implied or produced by either man involved. I will be consulting the prosecuting attorney's office."

Defendant's Exhibit 39 is a "Property Confiscation Report" identifying the items taken from Mr. Higgins' car on January 17, 1993. It shows that these were transferred to Chief Grice on January 20, 1993, and then from the Chief to Mr. Higgins on January 26, 1993. Chief Grice states that Higgins told him that two other items were missing: (1) a wrist watch, and (2) $200.

Mr. Higgins wrote a letter to Dr. L.A. Davis, Jr., Chancellor of UAPB dated January 21, 1993. A copy of the letter is shown as having been sent to Chief Grice. The Chief is not sure when he received the copy. The later claims that Officer Ray removed an "artillery box and artillery ammunition and also two hundred dollars in cash removed from the glove compartment." There is no mention of a missing watch and Mr. Higgins' letter does not identify the person with him during the confrontation with Officer Ray. The Court finds it somewhat strange that Mr. Higgins would write to the Chancellor to complain and not report that a University Coach, or even a fellow student, had witnessed the incident. Mr. Higgins was not called to testify at the trial.

Defendant's Exhibit 421 although identifying the "investigating officers" as "Investigator Terry Morrison, Arkansas State Police and Director Ronnie Grice, UAPB Police Department" is really the work-product of Chief Grice. This report is a partisan, argumentative, statement of the events of January 17, 1993. It was prepared between January 25–28 according to the Chief's recollection. It is full of factual errors and fully reflects that Chief Grice was making all credibility determinations against Ray's interests. And he made this report, according to his own testimony, after having already decided to fire Officer Ray. And, again, the Court finds it strange that a full investigative report on the Higgins incident does not identify or mention either a "Coach McNeil" or Charles McCullough as a witness! See Defendant's Exhibit 41.

At the bottom of the first page of Defendant's Exhibit 42 Chief Grice states:

> "As to the missing items, two hundred (200) dollars and the watch it is one man's word against another one ... Officer Ray did not turn in a report regarding this incident."

Of course, put that way, the whole statement is "one man's word against another." And it is simply not true that Officer Ray did not turn in a report regarding this incident. He actually prepared a report on January 17. When the Chief said he could not find it, Ray

prepared another, Defendant's Exhibit 38, which Chief Grice acknowledges he received on January 20, 1993, days before he prepared Defendant's Exhibit 42.

In Defendant's Exhibit 42 Chief Grice writes up the "facts" in a way that would support an argument that Officer Ray had violated the "plain view doctrine" and he concludes that "the search was improper," and he concurs that Mr. Higgins' had a valid complaint. And in the body of the report Chief Grice states: "On behalf of Officer Ray (sic) past performances in handling these sitution (sic) it is our opinion the "plain view" doctrine was violated." When asked what he was referring to, the Chief referred to incidents that occurred in April 1992. These incidents were not mentioned in Plaintiff's Exhibit 39, the list of complaints and charges against Ray which are said to constitute the reasons for discharge.

The Court has examined the facts concerning these April 1992 incidents as related by the Chief and explained by Officer Ray and credits Officer Ray's account thereof. And apparently at the time Chief Grice must also have accepted Ray's version because no charges or complaints were made concerning them. And the Chief rated Ray's performance highly—from "fully satisfactory" to "exceeds standards." Indeed he signed such a performance evaluation on July 13, 1992, just a few months after the April incidents which he mentions derogatorily for the first time in January 25–28, 1993. See Plaintiff's Exhibit 44. And, interestingly, the Chief gave a deposition in July 1992 in which he acknowledged Ray to be a good officer and that he had no problem with his job performance.[4]

Chief Grice discussed the Higgins matter with Ray briefly on January 29, 1993, during the same meeting in which he confronted Ray about working for P.J.'s. See Defendant's Exhibit 41A and Plaintiff's Exhibit 35. Both of these "Follow-up Investigation" reports were made on February 1, 1993. In Defendant's Exhibit 41A Chief Grice states that he informed Ray of Higgins' complaint "regarding two-hundred (200.0) dollars and a watch missing from his vehicle ..." But Chief Grice also acknowledged in that report, "Officer Ray admitted to no wrongdoing and would submit to a polygraph. This incident is still under investigation." But apparently this investigation ended after Ray's termination. Ray asked Chief Grice to set up a polygraph test. Grice said he told State Policeman Morrison about the request by Ray and left the follow-up to him (Morrison). But Morrison never asked Ray to take a polygraph. According to Grice, Morrison asked Higgins to take a polygraph, but he apparently refused.

The plaintiff did not see or become aware of the following documents concerning the Higgins matter until after this lawsuit was filed in April 1993:

1. Defendant's Exhibit 40—January 21, 1993 letter from Higgins to Chancellor.

2. Defendant's Exhibit 41—January 25, 1993 statement of Charles McCullough. Written at request of Chief Grice.

3. Defendant's Exhibit 41A—February 1, 1993, "Follow–Up" Report by Chief Grice.

4. Defendant's Exhibit 42—Investigative Summary by Morrison and Grice.

This record suggests that Officer Ray was under a cloud almost from the time Chief Grice took over. His reinstatement in late 1991 was not popular in certain areas. A portion of the student body resented the University's having even one white officer.

---

4. On several occasions Chief Grice justified not giving true and candid answers about the quality of Ray's work in reports or depositions given by him on the ground that he was just trying to protect the interests of UAPB. He gave such a rationale for not identifying the Higgins matter as a reason for Ray's termination, explaining that he was concerned about its impact upon Mr. Higgins' claim. On another occasion he justified the complimentary testimony about Officer Ray in a deposition given in the civil case brought by the relatives of Andre McNeal on the ground that the University was going to need Ray's testimony to defend its interest in the matter. There was even some mention of "advice of counsel." Since it is the Court's view that the Chief's statements about the good quality of Ray's work were accurate reflections of his true judgment, no harm follows from such explanations. But in no event would concern to protect the University justify the giving of false testimony or consciously distorting or withholding the truth. And these explanations by Chief Grice bring into question his candor in testifying in this case.

Officer Ray was a hard-nosed policeman. He frequently came on strong.

The Court credits Ms. Wynn's testimony that around January 27, 1993, she had a conversation with the Chief. When the Chief learned that Officer Ray and Officer Walton had worked at P.J.'s, his reaction was an exuberant, "I got him! I got him! I'm going to fire him for insubordination." He also stated that he was planning to dock Walton some 40 hours. Ms. Wynn told the Chief in effect, "You can't do that. If you fire Ray, you're going to have to fire Walton." And on February 3, 1993, she discussed with Chief Grice, (Plaintiff's Exhibit 39), the letter addressed to Dr. Irvins by the Chief. She in effect told the Chief that "everybody had been doing this." The Chief dropped the subject with a "yeah."

The significance of Chief Grice's response as testified to by his secretary, Ms. Wynn, goes beyond the anti-Ray animus implicit in his reaction. It clearly suggests that the Chief was looking for an excuse to get rid of Officer Ray and, more importantly, it tends to reflect the Chief's view that, until that moment, he did *not* have a basis for terminating Mr. Ray. The importance and primacy of the "working-at-P.J.'s-without-obtaining-proper-permission" charge is also reflected in Plaintiff's Exhibit 33 wherein this "insubordination" is singled out as the reason for the Chief's termination recommendation. However, Ms. Wynn explained to the Chief the weakness of his position, as did, the Court finds, Dr. Irvin—all of which resulted in Plaintiff's Exhibit 39 which sets forth a litany of reasons and justifications for the Chief's termination decision. And this Court in its analysis of each of these stated reasons, has shown the lack of substance or merit therein.

A brief comment about Dr. Bobbie Irvins' role in this case. As indicated earlier herein, she acted essentially as a prosecutor rather than an independent, objective reviewer. She searched out and suggested additional charges and complaints that could be listed as reasons for Officer Ray's termination. She approved and sent out Plaintiff's Exhibit 4 (the February 10, 1993, letter from her to Ray informing Ray of his termination for "four insubordinations") without talking to Officer Ray or getting his response to the various charges and complaints against him. Ray did not see this letter until after the lawsuit was filed. When Ray did visit with Dr. Irvins during the first week of March 1993 she did not want to talk about the charges and complaint made against Ray. She simply stated she was upholding the termination because Ray could not take supervision from African Americans. The manner in which the "review" of Chief Grice's recommendation was handled reinforces the Court's finding that Ray's race was a major factor in the decision to fire him.

█ The Court finds and concludes that the reasons given by defendant for Mr. Ray's termination were pretextual. They were not the true reasons. During the trial and in post-trial argument the defendant suggested still other reasons that the defendant might have relied upon as legitimate bases for discharging Mr. Ray, such as the incidents in which he used his weapon and the arguments and disturbances at plaintiff's home involving a girl friend. There are two things wrong with defendant's position in this respect. First, there is nothing in this record to prove that the plaintiff acted improperly in those incidents and, second, and more important, the defendant did not rely upon any of them in arriving at its discharge decision.

Now the plaintiff does not automatically win his case by showing that the reasons given for defendant's adverse employment decisions were mere pretexts. He must still prove that the true reasons were either retaliation for his having filed certain EEOC claims, or his race, or both.

Based on the evidence and the reasonable inference arising therefrom the Court finds that Chief Grice became aware of Mr. Ray's June 30, 1992, EEOC claim before his meeting with the Sergeants early in July. And having reviewed his actual experience with Mr. Ray's performance of his duties from February 3, 1992, until that meeting, the Court can find no basis for his extreme reaction against Mr. Ray at that meeting other than the circumstances that Mr. Ray had filed an EEOC claim and, indirectly, Mr. Ray's race. I say "indirectly" because this

record does not provide evidence that Chief Grice is prejudiced towards whites generally. But he did view Mr. Ray's race as a negative factor when Ray had to confront certain black persons, mostly students, in the discharge of his official duties. The Court is convinced that the Chief was of the opinion that a white officer would be perceived negatively by a portion of his constituent community which, in turn, could lead to racial responses and confrontations. And he believed Ray to be a "troublemaker" for filing EEOC complaints against his Department.

When Congress enacted Title VII, it provided for limited exceptions under which an employer would not be liable for discrimination. Specifically, 42 U.S.C. § 2000e-2(e) provides in pertinent part as follows:

> Notwithstanding any other provision of this title, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a *bona fide occupational qualification* reasonably necessary to the normal operation of that particular business or enterprise ... (emphasis supplied.)

Thus, in certain limited circumstances, courts are to recognize the bona fide occupational qualification (bfoq) defense. Race is conspicuously absent from the statutory exceptions. This was clearly not an oversight. The plain language of the statute thus precludes a race-based bfoq. *See, e.g., King v. Board of Regents of the University of Wisconsin System,* 898 F.2d 533, 537 (7th Cir.1990); *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1308 (7th Cir.1989); *Hayes v. Shelby Memorial Hospital,* 726 F.2d 1543, 1547 (11th Cir.1984); *Miller v. Texas State Board of Barber Ex-*

*aminers,* 615 F.2d 650, 652 (5th Cir.1980). Courts have thus recognized that "it is ... not irrational, but it is clearly forbidden by Title VII, to refuse on racial grounds to hire someone because your customers or clientele do not like his race." *Rucker v. Higher Educational Aids Bd.,* 669 F.2d 1179, 1181 (7th Cir.1982).

However, even if a race-based bfoq was permissible under the statute, bfoqs are to be construed extremely narrowly, and the circumstances of this case would not warrant the exception. The bfoq exception has been construed by the Equal Employment Opportunity Commission, whose regulations are entitled to "great deference," *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), to be applicable only to job situations that require specific physical characteristics such as those necessarily possessed only by one sex. *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 545-46, 91 S.Ct. 496, 498, 27 L.Ed.2d 613 (1971) (Marshall, J., concurring). The Commission's regulations provide in pertinent part:

> (a)(1) The Commission will find that the following situations do not warrant the application of the bona fide occupational qualification exception:
>
> \* \* \* \* \* \*
>
> (iii) The refusal to hire an individual because of the preferences of coworkers, the employer, clients or customers except as covered specifically in subparagraph (2) of this paragraph.
>
> (2) Where it is necessary for the purpose of authenticity or genuineness, the Commission will consider sex, to be a bona fide occupational qualification, e.g., an actor or actress.

The Supreme Court has thus held that "the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

In the instant case, it is clear that there are some students at UAPB with a predisposition of racial animus toward white officers, and Officer Ray in particular. This form of "client" preference is no more permissible

1127

than any other, and will not justify the different treatment of white officers. Instead of condemning Officer Ray for not backing off when confronted with unjustified and overtly racist reactions from students, the proper response would be to severely criticize and condemn such manifestations of racist attitudes and to call it to the attention of the highest levels of the University Administration for further appropriate action.

The race of each of the UAPB Public Safety personnel for the period 1992–1993 is set forth on Plaintiff's Exhibit 5. Only one Public Safety Officer was white. Indeed only one other white person was employed in the Department during that period and that was Thomas Moore who served mostly as courier or errand person. After Officer Ray's termination he was replaced by two black officers: Michael Demory and Janelle Ealy. From the time of the termination of Officer Ray effective March 12, 1993, until July 15, 1993, the UAPB Department of Public Safety had no *white* police officers. The Complaint in this action was filed on April 30, 1993. On July 15, 1993, the Department hired Officer Pettus, a white male who, the Court understands, was given the position of an investigator. It is not clear if Officer Pettus' duties are similar to those of Officer Ray in requiring direct daily contact with students and faculty.

The Court finds and concludes that race was a motivating factor in the decision to discharge Officer Ray. Put another way, if Officer Ray had been black and all of the other facts and circumstances remained the same, the Court is convinced Officer Ray would not have been treated as he was; nor would he have been discharged.

The Court was called upon to answer the following questions:

1. Was Mr. Ray treated differently, harassed, and disciplined differently in retaliation for his having filed an EEOC charge of discrimination on May 23, 1991, in violation of 42 U.S.C. Section 2000e–3(a) and/or in violation of the settlement agreement of September 26, 1991?

The answer is "Yes."

2. Was Mr. Ray fired from his job on January 29, 1993 (effective March 12, 1993) in retaliation for his having filed the May 23, 1991 EEOC charge and/or the June 6, 1992 EEOC charge, and/or because of his race?

The answer, again, is "Yes."

What shall be the remedy or remedies?

■ The plaintiff seeks reinstatement. He will therefore be reinstated effective April 1, 1994. He will suffer no negative financial consequences as a result of his discharge. He will receive full back-pay until April 1, 1994, and reinstatement of all fringe benefits to which he would have been entitled had he not been discharged. He has asked for $10,000.00 in damages for the embarrassment, and mental anguish and emotional pain suffered and sustained as a direct consequence of defendant's unfair employment practices. The evidence fully sustains an award in the amount sought. Judgment will be entered accordingly.

There remains the issue of declaratory relief. The Court calls upon the parties to discuss this issue in an effort to agree upon an appropriate order consistent with the Court's findings and conclusions. The plaintiff will take the initiative. If the parties can agree to a precedent covering this issue, same should be submitted to the Court for its consideration on or before March 15, 1994. And if no agreement can be reached, each party will submit its own separate proposal or suggestions on or before that date.

The Court directs the plaintiff to prepare a precedent judgment covering the issues disposed of above, submit it to defendant for its review and approval as to form, and then to the Court for its consideration.

## JUDGMENT

This case having come on for trial to the Court on February 15, 16, 17 and 18, 1994; all parties having rested; oral argument having been made by the parties to the Court on February 22, 1994; this Court having filed its opinion dated March 3, 1994, containing the findings of fact and conclusions of law; and the Court being well and sufficiently advised in the premises,

IT IS, THEREFORE, CONSIDERED, ORDERED, ADJUDGED and DECREED:

1. That defendants subjected plaintiff, Kenneth Ray, to different terms and conditions of employment, harassment and discipline in retaliation against him for his having filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) on May 23, 1991, in violation of 42 U.S.C. § 2000e–3(a).

2. That the defendants have subjected plaintiff, Kenneth Ray, to different terms and conditions of employment, harassment and discipline in retaliation against him for his having filed a charge of race discrimination and retaliation with the EEOC on May 23, 1991, in violation of the settlement agreement entered into between plaintiff, defendants and the EEOC on September 26, 1991.

3. That the defendants discharged plaintiff, Kenneth Ray, on January 29, 1993, effective on March 12, 1993, because of his race, white, in violation of 42 U.S.C. § 2000e–2(a)(1).

4. That the defendants discharged plaintiff, Kenneth Ray, on January 29, 1993, effective on March 12, 1993, in retaliation against him for his having filed the May 23, 1991, and June 30, 1992, charges with the EEOC alleging racial discrimination and retaliation in violation of 42 U.S.C. § 2000e–3(a).

5. That the defendants will reinstate plaintiff, Kenneth Ray, to the position of Public Safety Officer I on April 1, 1994, at an annual salary of $16,429.00. Defendants will also pay plaintiff the sum of $10,638.00 in backpay from which shall be subtracted the portion of his contribution to TIAA/CREF, and defendants will further reinstate and restore to plaintiff all of the fringe benefits to which plaintiff would have been entitled had he not been discharged, including $846.75 to be contributed to TIAA/CREF on plaintiff's behalf.

6. When defendants reinstate plaintiff, Kenneth Ray, to his Public Safety Officer I job on April 1, 1994, they will further restore to him all of his former rights, privileges and non-racial and non-retaliatory working conditions.

7. That the defendants will pay plaintiff, Kenneth Ray, $10,000.00 in compensatory damages for the embarrassment, mental anguish and emotional pain he suffered and sustained as a direct consequence of defendants' unfair employment practices.

8. That defendants, their officers, administrators, supervisors, agents and employees will physically expunge and destroy all University of Arkansas at Pine Bluff's (UAPB) records and documents reflecting that plaintiff, Kenneth Ray, was discharged, and replace them with documents and records reflecting that plaintiff has been continuously employed by UAPB from November 1, 1989, to the present. They will also place a copy of the Court's judgment and the Court's order to be issued in all relevant files pertaining to plaintiff.

9. That defendants, their officers, administrators, supervisors, agents and employees will remove from any and all personnel files pertaining to Kenneth Ray in the Human Resources (Personnel) Office, the Police Department, the Office of the Vice Chancellor for Student Services, the Office of the Chancellor, and the Affirmative Action Office at UAPB, all records and documents reflecting disciplinary action taken against the plaintiff, Kenneth Ray, from February 3, 1993, to the date of the judgment. The documents to be removed will include Plaintiff's Exhibits 9, 12, 14, 15, 18, 19, 19A, 20, 22, 28, 29, 30, 31, 32, 33, 34, 35, 37, 39, 41, Defendants' Exhibits 18, 40, 41 41A, 42, 47, 49 and 50 and any other documents related to disciplinary action taken against plaintiff reflected in Plaintiff's Exhibit 39. Defendants may retain copies of Defendants' Exhibits 15 and 16, and Plaintiff's Exhibit 11 in the Chancellor's Office provided they are not retained in a personnel file related to plaintiff. Copies of all documents related to this case and the EEOC charges filed by plaintiff, including all exhibits, may be retained in litigation files in the Offices of the General Counsel of the University of Arkansas, the Attorney General of the State of Arkansas, and the UAPB Chancellor. Copies of Defendants' Exhibits 40, 41, 41A and 42 may be retained in litigation files pertaining to the Arkansas State Claims Commission case of *Kacy Higgins v.*

*UAPB* in the Office of the Chancellor of UAPB and the General Counsel's Office. Chief Ronnie Grice may retain a copy of his deposition and exhibits related thereto in his personal files, which are kept at his home. Access to documents, which have been retained in litigation or personal files, shall be limited to the extent permitted by law. The retained documents may not be used as a basis for any personnel decisions related to plaintiff Kenneth Ray.

10. That defendants, their officers, administrators, supervisors, agents and employees will pay plaintiff's attorney, John T. Lavey, an attorney's fee of $34,456.25 and reimburse him $1,900.65 for costs expended in this case for a total of $36,356.90.